

**REPLY TO:**
7 Century Drive, Suite 201
Parsippany, NJ 07054
973-538-4700

_____

74 Brick Boulevard, Suite 120
Brick, NJ 08723
732-279-3863

April 16, 2019

Clerk of the Bankruptcy Court
United States Bankruptcy Court
402 East State Street
Trenton, New Jersey 08608

    RE:  **JPMORGAN CHASE BANK, NATIONAL ASSOCIATION vs.**
         **CHRISTOPHER BRADY**
    Case No. 19-11703 MBK
    File No. 297GSU

Dear Sir/Madam:

Enclosed herewith please find a copy of a Proof of Claim and
Affidavit of Service regarding the above-captioned matter which was
filed electronically with the Court.

Very truly yours,
Fein, Such, Kahn & Shepard, P.C.




By: /S/ TINA DELIBRO
    Tina DeLibro
    Legal Assistant

Enclosure

**Fill in this information to identify the case**

Debtor 1 :    Christopher Brady

Debtor 2 :
(Spouse, if filing)

United States Bankruptcy Court for the:    District of:    New Jersey

Case number:    19-11703-MBK

Official Form 410

## Proof of Claim

4/19

Read the instructions before filling out this form. Use this form to make a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

### Part 1:    Identify the Claim

| | | |
|---|---|---|
| 1. | Who is the current creditor? | JPMorgan Chase Bank, National Association <br> Name of the current creditor (the person or entity to be paid for this claim) <br><br> Other names the creditor used with the debtor |
| 2. | Has this claim been acquired from someone else? | [X] No. <br> [ ] Yes.    From Whom? _____ |

| | | |
|---|---|---|
| 3. | Where should notices and payments to the Creditor be sent? <br><br> Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** <br><br> Chase Records Center <br> Name <br><br> Attn: Correspondence Mail <br> Mail Code LA4-5555 <br><br> 700 Kansas Lane <br> Number   Street <br><br> Monroe   LA   71203 <br> City   State   Zip Code <br><br> Contact phone   1-866-520-6447 <br> Contact email <br><br> **Where should payments to the creditor be sent? (if different)** <br><br> JPMorgan Chase Bank, N.A. <br> Name <br><br> Mail Code: OH4-7164 <br><br> P.O. Box 24785 <br> Number   Street <br><br> Columbus   OH   43224 <br> City   State   Zip Code <br><br> Contact phone   1-866-520-6447 <br> Contact email <br><br> Uniform claim identifier for electronic payments in chapter 13 (if you use one): _____ |

| | | |
|---|---|---|
| 4. | Does this claim amend one already filed? | [X] No. <br> [ ] Yes.    Claim number on court claims registry (if known) _____   Filed on _____ <br>            mm / dd / yy |
| 5. | Do you know if anyone else has filed a proof of claim for this claim? | [X] No. <br> [ ] Yes.    Who made the earlier filing? _____ |

Reviewer ID: Sokhom_Sim_2019-04-12_13:27:00

Debtor Name    Christopher Brady    Case Number (if known)    19-11703-MBK

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

6   Do you have any number you use to identify the debtor?

[ ] No.

[X] Yes.    Last 4 digits of the debtor's account or any number you use to identify the debtor:    3645

7.  How much is the claim?    $    381,624.07

Does this amount include interest or other charges?

[ ] No.

[X] Yes, Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(C)(2)(A)

8.  What is the basis of the claim?

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card.
Attach any documents supporting the claim required by Bankruptcy Rule 3001(c).
Limit disclosing information that is entitled to privacy, such as healthcare information.

Money Loaned

9.  Is all or part of the claim secured?

[ ] No.

[X] Yes.    The claim is secured by a lien on property.
Nature of property

[X] Real estate. If the claim is secured by the debtor's principal residence, file a Mortgage Proof of Claim Attachment (Official Form 410-A) with this Proof of Claim.

[ ] Motor vehicle

[ ] Other. Describe:

Basis for perfection:    Recorded Security Instrument
Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of Property:    $

Amount of the claim that is secured:    $ 381,624.07

Amount of the claim that is unsecured:    $ _____    (The sum of secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition:    $  107,289.41

Amount Interest Rate (When case was filed):    0.0000%
[X] Fixed
[ ] Variable

10.  Is this claim based on a lease?

[X] No.

[ ] Yes. Amount necessary to cure any default as of the date of the petition.    $    -

11.  Is this claim subject to a right of setoff?

[X] No.

[ ] Yes. Identify the property:

Official Form 410    Proof of Claim    page 2

Reviewer ID: Sokhom_Sim_2019-04-12_13:27:00

| Debtor Name | Christopher Brady | Case Number (if known) | 19-11703-MBK |
| --- | --- | --- | --- |

**12.** Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a).

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

[X] No

[ ] Yes. Check that all apply.

Amount entitled to priority

[ ] Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $ _____

[ ] Up to $3.025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $ _____

[ ] Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $ _____

[ ] Taxes or penalties owed to governmental units.    $ _____

[ ] Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).

[ ] Other. Specify subsection of 11 U.S.C. § 507(a)(  ) that applies.    $ _____

\* Amounts are subject to adjustment on 4/1/22 and every 3 years after that for cases begun on or after the date of adjustment.

**Part 3:   Sign Below**

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.

Check the appropriate boxes:

[ ] I am the creditor.

[X] I am the creditor's attorney or authorized agent.

[ ] I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

[ ] I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    04/16/19
MM/DD/YYYY

/s/Jill A Manzo
Signature

Print the name of the person who is completing and signing this claim:

Name    JILL A. MANZO, ESQ.
First Name      Middle Name      Last Name

Title    ATTORNEY

Company    FEIN, SUCH, KAHN & SHEPARD, PC
Identify the corporate servicer as the company if the authorized agent is a servicer.

Address    7 CENTURY DRIVE, SUITE 201
Number      Street

PARSIPPANY, NJ 07054
City      State      Zip Code

Contact Phone    (973) 538-4700    Email    bankruptcy@feinsuch.com

Reviewer ID: Sokhom_Sim_2019-04-12_13:27:00

Mortgage Proof of Claim Attachment

04/16

Mortgage Proof of Claim Attachment
If you file a claim secured by a security interest in the debtor's principal residence, you must use this form as an attachment to your proof of claim. See separate instructions.

**Part 1: Mortgage and Case Information**
Case number: 19-11703-MBK
Debtor 1: Christopher Brady
Debtor 2:
Last 4 digits to identify: 3645
Creditor: JPMorgan Chase Bank, National Association
Servicer: JPMorgan Chase Bank, N.A.
Fixed accrual/daily
simple interest/other: DSI - Fixed

**Part 2: Total Debt Calculation**
| | |
|---|---|
| Principal Balance: | $306,008.31 |
| Deferred Balance: | $0.00 |
| Interest due: | $65,600.59 |
| Fees, costs due: | $0.00 |
| Escrow deficiency for funds | $10,015.17 |
| Less total funds on hand: | $0.00 |
| Total debt: | $381,624.07 |

**Part 3: Arrearage as of Date of the Petition**
| | |
|---|---|
| Principal & interest due: | $96,181.24 |
| Prepetition fees due: | $0.00 |
| Escrow deficiency for funds advanced: | $10,015.17 |
| Projected escrow shortage: | $1,093.00 |
| Less funds on hand: | $0.00 |
| Amount waived post-petition | |
| Amount per Court Order | |
| Total prepetition arrearage: | $107,289.41 |
| Post-petition payments included by debtor or court in Total Arrearage: | $0.00 |
| Total Arrearage | $107,289.41 |

**Part 4: Monthly Mortgage Payment**
| | |
|---|---|
| Principal & interest: | $2,432.57 |
| Monthly escrow: | $156.17 |
| Private mortgage insurance: | $0.00 |
| Total monthly payment: | $2,588.74 |

Case Number: 19-11703-MBK
Debtor 1: Christopher Brady

**Part 5 : Loan Payment History from First Date of Default**

| A. Date | B. Contractual Payment Amount | C. Funds Received | D. Amount Incurred | E. Description | F. Contractual Due Date | G. Prin, int & esc past due balance | H. Amount to principal | I. Amount to Interest | J. Amount to escrow | K. Amount to fees or charges | L. Unapplied funds | M. Principal balance | N. Accrued interest balance | O. Escrow balance | P. Fees / Charges balance | Q. Unapplied funds balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | $0.00 | | | | | | | | | | |
| 09/01/2011 | $639.19 | | | Payment Due | | $639.19 | | | | | | $302,248.77 | | $0.00 | $0.00 | $0.00 |
| 10/01/2011 | $618.57 | | | Payment Due | | $1,257.76 | | | | | | $302,248.77 | | $0.00 | $0.00 | $0.00 |
| 11/01/2011 | $639.20 | | | Payment Due | | $1,896.96 | | | | | | $302,248.77 | | $0.00 | $0.00 | $0.00 |
| 12/01/2011 | $618.57 | | | Payment Due | | $2,515.53 | | | | | | $302,248.77 | | $0.00 | $0.00 | $0.00 |
| 01/01/2012 | $639.20 | | | Payment Due | | $3,154.73 | | | | | | $302,248.77 | | $0.00 | $0.00 | $0.00 |
| 02/01/2012 | $638.80 | | | Payment Due | | $3,793.53 | | | | | | $302,248.77 | | $0.00 | $0.00 | $0.00 |
| 02/01/2012 | | | | Discount Added | | $3,793.53 | ($1,879.77) | | | | | $304,128.54 | | $0.00 | $0.00 | $0.00 |
| 03/01/2012 | $596.96 | | | Payment Due | | $4,390.49 | | | | | | $304,128.54 | | $0.00 | $0.00 | $0.00 |
| 04/01/2012 | $641.41 | | | Payment Due | | $5,031.90 | | | | | | $304,128.54 | | $0.00 | $0.00 | $0.00 |
| 05/01/2012 | $620.72 | | | Payment Due | | $5,652.62 | | | | | | $304,128.54 | | $0.00 | $0.00 | $0.00 |
| 06/01/2012 | $641.41 | | | Payment Due | | $6,294.03 | | | | | | $304,128.54 | | $0.00 | $0.00 | $0.00 |
| 07/01/2012 | $620.73 | | | Payment Due | | $6,914.76 | | | | | | $304,128.54 | | $0.00 | $0.00 | $0.00 |
| 08/01/2012 | $641.41 | | | Payment Due | | $7,556.17 | | | | | | $304,128.54 | | $0.00 | $0.00 | $0.00 |
| 09/01/2012 | $641.41 | | | Payment Due | | $8,197.58 | | | | | | $304,128.54 | | $0.00 | $0.00 | $0.00 |
| 10/01/2012 | $620.72 | | | Payment Due | | $8,818.30 | | | | | | $304,128.54 | | $0.00 | $0.00 | $0.00 |
| 11/01/2012 | $641.41 | | | Payment Due | | $9,459.71 | | | | | | $304,128.54 | | $0.00 | $0.00 | $0.00 |
| 12/01/2012 | $620.72 | | | Payment Due | | $10,080.43 | | | | | | $304,128.54 | | $0.00 | $0.00 | $0.00 |
| 01/01/2013 | $641.42 | | | Payment Due | | $10,721.85 | | | | | | $304,128.54 | | $0.00 | $0.00 | $0.00 |
| 01/30/2013 | | | | Discount Added | | $10,721.85 | ($1,879.77) | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 02/01/2013 | $641.80 | | | Payment Due | | $11,363.65 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 03/01/2013 | $581.70 | | | Payment Due | | $11,945.35 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 04/01/2013 | $647.15 | | | Payment Due | | $12,592.50 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 05/01/2013 | $624.10 | | | Payment Due | | $13,216.60 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 06/01/2013 | $647.14 | | | Payment Due | | $13,863.74 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 07/01/2013 | $626.27 | | | Payment Due | | $14,490.01 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 08/01/2013 | $647.14 | | | Payment Due | | $15,137.15 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 09/01/2013 | $647.15 | | | Payment Due | | $15,784.30 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 10/01/2013 | $626.27 | | | Payment Due | | $16,410.57 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 11/01/2013 | $647.14 | | | Payment Due | | $17,057.71 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 12/01/2013 | $626.27 | | | Payment Due | | $17,683.98 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 01/01/2014 | $647.15 | | | Payment Due | | $18,331.13 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 02/01/2014 | $647.14 | | | Payment Due | | $18,978.27 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 03/01/2014 | $584.52 | | | Payment Due | | $19,562.79 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 04/01/2014 | $647.14 | | | Payment Due | | $20,209.93 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 05/01/2014 | $626.27 | | | Payment Due | | $20,836.20 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 06/01/2014 | $647.15 | | | Payment Due | | $21,483.35 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 07/01/2014 | $626.27 | | | Payment Due | | $22,109.62 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 08/01/2014 | $647.14 | | | Payment Due | | $22,756.76 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 09/01/2014 | $647.15 | | | Payment Due | | $23,403.91 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 10/01/2014 | $626.26 | | | Payment Due | | $24,030.17 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 11/01/2014 | $647.15 | | | Payment Due | | $24,677.32 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 12/01/2014 | $626.27 | | | Payment Due | | $25,303.59 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 01/01/2015 | $647.14 | | | Payment Due | | $25,950.73 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 02/01/2015 | $647.15 | | | Payment Due | | $26,597.88 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 03/01/2015 | $584.52 | | | Payment Due | | $27,182.40 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 04/01/2015 | $647.14 | | | Payment Due | | $27,829.54 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 05/01/2015 | $626.27 | | | Payment Due | | $28,455.81 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 06/01/2015 | $647.14 | | | Payment Due | | $29,102.95 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 07/01/2015 | $626.27 | | | Payment Due | | $29,729.22 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 08/01/2015 | $647.15 | | | Payment Due | | $30,376.37 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 09/01/2015 | $647.14 | | | Payment Due | | $31,023.51 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 10/01/2015 | $626.27 | | | Payment Due | | $31,649.78 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 11/01/2015 | $647.15 | | | Payment Due | | $32,296.93 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 12/01/2015 | $626.26 | | | Payment Due | | $32,923.19 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 01/01/2016 | $647.15 | | | Payment Due | | $33,570.34 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |

Official Form 410A

Mortgage Proof of Claim Attachment

Reviewer ID: Sokhom_Sim_2019-04-12_13:27:00

Mortgage Proof of Claim Attachment

04/16

Part 5 : Loan Payment History from First Date of Default

| A. Date | B. Contractual Payment Amount | C. Funds Received | D. Amount Incurred | E. Description | F. Contractual Due Date | G. Prin, Int & esc past due balance | H. Amount to principal | I. Amount to interest | J. Amount to escrow | K. Amount to fees or charges | L. Unapplied funds | M. Principal balance | N. Accrued Interest balance | O. Escrow balance | P. Fees / Charges balance | Q. Unapplied funds balance |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 02/01/2016 | $690.72 | | | Payment Due | | $34,261.06 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 03/01/2016 | $664.36 | | | Payment Due | | $34,925.42 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 04/01/2016 | $710.17 | | | Payment Due | | $35,635.59 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 05/01/2016 | $687.26 | | | Payment Due | | $36,322.85 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 06/01/2016 | $710.18 | | | Payment Due | | $37,033.03 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 07/01/2016 | $687.26 | | | Payment Due | | $37,720.29 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 08/01/2016 | $710.17 | | | Payment Due | | $38,430.46 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 09/01/2016 | $710.18 | | | Payment Due | | $39,140.64 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 10/01/2016 | $687.26 | | | Payment Due | | $39,827.90 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 11/01/2016 | $710.18 | | | Payment Due | | $40,538.08 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 12/01/2016 | $687.26 | | | Payment Due | | $41,225.34 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 01/01/2017 | $1,979.91 | | | Payment Due | | $43,205.25 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 02/01/2017 | $2,030.56 | | | Payment Due | | $45,235.81 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 03/01/2017 | $1,971.63 | | | Payment Due | | $47,207.44 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 04/01/2017 | $2,046.84 | | | Payment Due | | $49,254.28 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 05/01/2017 | $2,065.78 | | | Payment Due | | $51,320.06 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 06/01/2017 | $2,111.81 | | | Payment Due | | $53,431.87 | | | | | | $306,008.31 | | $0.00 | $0.00 | $0.00 |
| 06/02/2017 | | | | Escrow Advance | | $53,431.87 | | | ($6,269.54) | | | $306,008.31 | | ($6,269.54) | $0.00 | $0.00 |
| 06/30/2017 | | | | Interest Escrow Deposit | | $53,431.87 | | | $0.23 | | | $306,008.31 | | ($6,269.31) | $0.00 | $0.00 |
| 07/01/2017 | $2,084.64 | | | Payment Due | | $55,516.51 | | | | | | $306,008.31 | | ($6,269.31) | $0.00 | $0.00 |
| 07/27/2017 | | | | Flood Insurance | | $55,516.51 | | | ($1,876.00) | | | $306,008.31 | | ($8,145.31) | $0.00 | $0.00 |
| 08/01/2017 | $2,128.65 | | | Payment Due | | $57,645.16 | | | | | | $306,008.31 | | ($8,145.31) | $0.00 | $0.00 |
| 09/01/2017 | $2,137.04 | | | Payment Due | | $59,782.20 | | | | | | $306,008.31 | | ($8,145.31) | $0.00 | $0.00 |
| 09/30/2017 | | | | Interest Escrow Deposit | | $59,782.20 | | | $0.69 | | | $306,008.31 | | ($8,144.62) | $0.00 | $0.00 |
| 10/01/2017 | $2,206.04 | | | Payment Due | | $61,988.24 | | | | | | $306,008.31 | | ($8,144.62) | $0.00 | $0.00 |
| 11/01/2017 | $2,147.53 | | | Payment Due | | $64,135.77 | | | | | | $306,008.31 | | ($8,144.62) | $0.00 | $0.00 |
| 12/01/2017 | $2,176.79 | | | Payment Due | | $66,312.56 | | | | | | $306,008.31 | | ($8,144.62) | $0.00 | $0.00 |
| 12/30/2017 | | | | Interest Escrow Deposit | | $66,312.56 | | | $0.69 | | | $306,008.31 | | ($8,143.93) | $0.00 | $0.00 |
| 01/01/2018 | $2,147.53 | | | Payment Due | | $68,460.09 | | | | | | $306,008.31 | | ($8,143.93) | $0.00 | $0.00 |
| 01/02/2018 | | | | Interest Escrow Deposit | | $68,460.09 | | | $0.02 | | | $306,008.31 | | ($8,143.91) | $0.00 | $0.00 |
| 02/01/2018 | $2,225.00 | | | Payment Due | | $70,685.09 | | | | | | $306,008.31 | | ($8,143.91) | $0.00 | $0.00 |
| 03/01/2018 | $2,241.76 | | | Payment Due | | $72,926.85 | | | | | | $306,008.31 | | ($8,143.91) | $0.00 | $0.00 |
| 03/31/2018 | | | | Interest Escrow Deposit | | $72,926.85 | | | $0.66 | | | $306,008.31 | | ($8,143.25) | $0.00 | $0.00 |
| 04/01/2018 | $2,147.71 | | | Payment Due | | $75,074.56 | | | | | | $306,008.31 | | ($8,143.25) | $0.00 | $0.00 |
| 05/01/2018 | $2,273.20 | | | Payment Due | | $77,347.76 | | | | | | $306,008.31 | | ($8,143.25) | $0.00 | $0.00 |
| 06/01/2018 | $2,239.84 | | | Payment Due | | $79,587.60 | | | | | | $306,008.31 | | ($8,143.25) | $0.00 | $0.00 |
| 06/09/2018 | | | | Flood Insurance | | $79,587.60 | | | ($1,874.00) | | | $306,008.31 | | ($10,017.25) | $0.00 | $0.00 |
| 06/30/2018 | | | | Interest Escrow Deposit | | $79,587.60 | | | $0.69 | | | $306,008.31 | | ($10,016.56) | $0.00 | $0.00 |
| 07/01/2018 | $2,340.19 | | | Payment Due | | $81,927.79 | | | | | | $306,008.31 | | ($10,016.56) | $0.00 | $0.00 |
| 08/01/2018 | $2,319.40 | | | Payment Due | | $84,247.19 | | | | | | $306,008.31 | | ($10,016.56) | $0.00 | $0.00 |
| 09/01/2018 | $2,371.71 | | | Payment Due | | $86,618.90 | | | | | | $306,008.31 | | ($10,016.56) | $0.00 | $0.00 |
| 10/01/2018 | $2,371.71 | | | Payment Due | | $88,990.61 | | | | | | $306,008.31 | | ($10,016.56) | $0.00 | $0.00 |
| 10/01/2018 | | | | Interest Escrow Deposit | | $88,990.61 | | | $0.70 | | | $306,008.31 | | ($10,015.86) | $0.00 | $0.00 |
| 11/01/2018 | $2,355.03 | | | Payment Due | | $91,345.64 | | | | | | $306,008.31 | | ($10,015.86) | $0.00 | $0.00 |
| 12/01/2018 | $2,436.70 | | | Payment Due | | $93,782.34 | | | | | | $306,008.31 | | ($10,015.86) | $0.00 | $0.00 |
| 12/31/2018 | | | | Interest Escrow Deposit | | $93,782.34 | | | $0.69 | | | $306,008.31 | | ($10,015.17) | $0.00 | $0.00 |
| 01/01/2019 | $2,399.05 | | | Payment Due | | $96,181.39 | | | | | | $306,008.31 | | ($10,015.17) | $0.00 | $0.00 |
| 01/28/2019 | | | | BK Filed Date | | $96,181.39 | | | | | | $306,008.31 | | ($10,015.17) | $0.00 | $0.00 |

Official Form 410A

Mortgage Proof of Claim Attachment

Reviewer ID: Sokhom_Sim_2019-04-12_13:27:00

Loan #        3645        Case #        19-11703-MBK

## Disclosure

Part 3 of form B410A requires Chase to calculate the prepetition escrow deficiency for funds advanced and the projected escrow shortage separately from the principal and interest (P&I) portion of all monthly installments that remain unpaid as of the petition date. In order to make this calculation, Chase adjusts its system to reduce the escrow portion of the monthly installment payment to $0.01 for each escrow advance type. For example, where the unpaid monthly installment payments were $1,200 ($800 P&I, $300 taxes, $100 insurance) prior to bankruptcy, the unpaid monthly installment payments will be reduced to $800.02 ($800 P&I, $0.01 taxes, $0.01 insurance). Please note that to the extent that Private Mortgage Insurance ("PMI") is contained within the monthly installment payment, it is also reduced to a penny in this process.

Because the adjustment process occurs before part 5 of form B410A is completed, any unpaid monthly installment payments listed in column B (and the past due balance in Column G) will be listed at the reduced amount rather than the contractual payment amount listed in monthly statements received prior to bankruptcy.

Monthly installment payments listed on part 5 that were paid prior to the petition date include the full prepetition escrow payment because those payments were made and applied prior to the reduction of the escrow payment. In the example provided, paid monthly installments in part 5 would be listed at $1,200. Unpaid monthly installments listed in part 5 would be listed at $800.02. The debtor's post-petition escrow payment is also not impacted by this process and is set forth in Part 4 of form B410A.

Reviewer ID: Sokhom_Sim_2019-04-12_13:27:00

**BK Case #:   19-11703-BMK    Proof Of Claim Attachment    Loan #:        3645**

This proof of claim reflects a change in interest rate, and a change in payment, on the debtor's account that is the subject of this proof of claim.  Specifically, Chase has voluntarily reduced the debtor's interest rate on the account to 0.00% effective as of 01/06/19.  While this reduction remains in effect, Chase will waive the interest the debtor would otherwise be obligated to pay under the terms of the account.  This means that Chase will not require the debtor to pay the difference between the rate due under the account and the reduced 0.00% interest rate during the term of the bankruptcy proceeding.  This reduced rate will remain in effect until the earlier to occur of the following:  (a) the Court enters an order granting Chase relief from the automatic stay, (b) the debtor's bankruptcy proceeding is dismissed, (c) the debtor's bankruptcy proceeding is converted to a Chapter 7 bankrutpcy case, or (d) the debtor is discharged by the Bankruptcy Court in his or her Chapter 13 case.  Upon the occurrence of any of these events, the debtor's interest rate and related payment will revert back to the higher rate and the payment determined in accordance with the account agreement.  If during the term of the bankruptcy proceeding, the account agreement required the debtor to begin making principal payments, the principal payments will continue to be required as per the terms of the account agreement.  This change does not constitute a permanent modification of the payment obligations under the terms of the promissory notes, mortgage, HELOC or loan agreement or other loan documents.

Reviewer ID: Sokhom_Sim_2019-04-12_13:27:00



## CHASE ◯

3415 Vision Dr
Columbus OH 43219
1-800-848-9136

### Annual Escrow Account Disclosure Statement

| | | | | |
|---|---|---|---|---|
| NAME | CHRISTOPHER BRADY | | LOAN NUMBER | |
| NAME | | | ANALYSIS AS OF | 1/28/2019 |
| ADDRESS | 313 CEDAR AVE | | | |
| CITY,STATE,ZIP | MANASQUAN NJ 08736 | | | |

**CURRENT LOAN INFORMATION:**

| | |
|---|---|
| PRINCIPAL BALANCE: | $306,008.31 |
| (THIS IS NOT YOUR PAYOFF AMOUNT) | |
| ESCROW BALANCE: | ($10,015.17) |
| NEXT PAYMENT DUE: | 2/1/2013 |
| ANTICIPATED ESCROW BALANCE: | ($10,015.02) |

**PRIOR PAYMENT BREAKDOWN:**

| | |
|---|---|
| P&I: | $641.80 |
| ESCROW: | $0.00 |
| OTHER ESCROW: | |
| SUBSIDY: | |
| TOTAL: | $641.80 |

**NEW PAYMENT BREAKDOWN:**

| | |
|---|---|
| P&I: | $2,432.57 |
| ESCROW: | $156.17 |
| SHORTAGE SPREAD: | $0.00 |
| OTHER ESCROW: | $0.00 |
| SUBSIDY: | $0.00 |
| TOTAL: | $2,588.74 |

**NEW PAYMENT EFFECTIVE DATE:**    2/1/2019

### GENERAL ESCROW ACCOUNT INFORMATION

| ESCROW ITEM | NEXT DUE DATE | PROJECTED ANNUAL DISBURSEMENTS | DIVIDED BY PAYMENTS PER YEAR | MONTHLY REQUIREMENT |
|---|---|---|---|---|
| Flood Insurance | 6/1/2019 | $1,874.00 | 12 | $156.17 |
| | | | 12 | $0.00 |
| | | | 12 | $0.00 |
| | | | 12 | $0.00 |
| | | | 12 | $0.00 |
| | | | 12 | $0.00 |
| | | | 12 | $0.00 |
| | | | 12 | $0.00 |
| | | | 12 | $0.00 |
| | | | 12 | $0.00 |
| | | | 12 | $0.00 |
| | | | 12 | $0.00 |
| | | | 12 | $0.00 |
| | | | 12 | $0.00 |
| | | | 12 | $0.00 |
| | | | 12 | $0.00 |
| | | | 12 | $0.00 |
| | | | 12 | $0.00 |
| | | | 12 | $0.00 |
| | | | 12 | $0.00 |

| | | | |
|---|---|---|---|
| **TOTAL MONTHLY ESCROW PAYMENT:** | $156.17 | **TOTAL CUSHION:** | $0.00 |

**NOTE:** Private Mortgage and Mortgage Insurance is not included in the Allowable Cushion. Per the General Escrow Account Information above, the amount of this insurance you have is:    $0.00    per month. This amount times the number of Allowable Cushion months has been withheld from the total Cushion used in calculating the Target Balance.

### SURPLUS OR SHORTAGE CALCULATION:

| PROJECTED LOW BALANCE | + CUSHION | = TARGET BALANCE | ANTICIPATED ESCROW BALANCE | - TARGET BALANCE | = SHORTAGE |
|---|---|---|---|---|---|
| $1,093.15 | $0.00 | $1,093.15 | ($10,015.02) | $1,093.15 | ($11,108.17) |

| | | |
|---|---|---|
| # MONTHS CUSHION: 0 | SHORTAGE/SURPLUS SPREAD IN MONTHS: | 12 |

**NOTE:** Target Balance is the beginning balance necessary to bring your escrow account, at its lowest point during the next 12 months, to zero plus the allowed cushion. The Anticipated Balance is your current escrow balance, adding any payments and subtracting any bills due not yet paid between the Analysis As of Date and the New Payment Effective Date.

### NEW PAYMENT CALCULATION:

| TOTAL AMOUNT PER PAYMENT | + OTHER ESCROWS | + SHORTAGE SPREAD | + PRINCIPAL & INTEREST | = TOTAL NEW PAYMENT |
|---|---|---|---|---|
| $156.17 | $0.00 | $0.00 | $2,432.57 | $2,588.74 |

Reviewer ID: Sokhom_Sim_2019-04-12_13:27:00

## Anticipated Escrow Balance Calculation

| | |
|---|---|
| Loan Number: | ▓▓▓▓▓ |
| Mortgagor: | CHRISTOPHER BRADY |
| Current Due Date of Loan: | 2/1/2013 |
| Effective Date of Analysis: | 2/1/2019 |

| Description | Amount | Balance |
|---|---|---|
| Current Escrow Balance | ($10,015.17) | ($10,015.17) |
| Total Escrow Due | $0.15 | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |
| | | ($10,015.02) |

**Anticipated Escrow Balance Effective**   2/1/2019   ($10,015.02)

**Directions:**

1) Add any payments yet to be made OR subtract any payments already made up to the effective date of the analysis.

**For example:** The loan is due for 10/1/04. The effective date is 11/1/04. ADD the October payment for escrow only, as shown on REI1. *This should be entered as a positive.*

**For example:** The loan is due for 1/1/05. The effective date is 11/1/04. SUBTRACT the December -and- November payments as made on RE history. *These should be entered as a negative.*

2) Subtract any escrow bills due between today's date and the effective date of the analysis. *These should be entered as a negative.*

*The Anticipated Escrow Balance used on your Escrow Analysis statement is the calculated or "anticipated" escrow balance expected to be in your escrow account on the effective date of the Analysis. The Anticipated Escrow Balance is subtracted from your Target Escrow Balance to determine your escrow shortage or surplus.*

Reviewer ID: Sokhom_Sim_2019-04-12_13:27:00

## Target Balance Calculation

Loan #: ▮▮▮▮▮▮▮▮
Escrow Analysis Dated: 1/28/2019
Low Point Balance: $1,093.15

| Date | Deposits | Disbursements | Total |
|---|---|---|---|
| When calculating low point, always start with a zero balance: | | | $0.00 |
| 02/2019 | $156.17 | | $156.17 |
| 03/2019 | $156.17 | | $312.34 |
| 04/2019 | $156.17 | | $468.51 |
| 05/2019 | $156.17 | | $624.68 |
| 06/2019 | $156.17 | | $780.85 |
| | | $1,874.00 | ($1,093.15) |
| 07/2019 | $156.17 | | ($936.98) |
| 08/2019 | $156.17 | | ($780.81) |
| 09/2019 | $156.17 | | ($624.64) |
| 10/2019 | $156.17 | | ($468.47) |
| 11/2019 | $156.17 | | ($312.30) |
| 12/2019 | $156.17 | | ($156.13) |
| 01/2020 | $156.17 | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |
| | | | $0.04 |

## Detailed Escrow Summary

| LOAN NUMBER | BORROWER | ACTIVITY FROM - TO | ESCROW START |
|---|---|---|---|
| ███████████ | CHRISTOPHER BRADY | 1/1/2018 to 1/28/2019 | ($8,143.93) |

| TRANSACTION_DATE | ESCROW_AMT | TRAN_DESCRIPTION | RUNNING_ESCROW |
|---|---|---|---|
| 12/31/2018 | $0.69 | INTEREST ON ESCROW DEPOSIT | ($10,015.17) |
| 10/1/2018 | $0.70 | INTEREST ON ESCROW DEPOSIT | ($10,015.86) |
| 6/30/2018 | $0.69 | INTEREST ON ESCROW DEPOSIT | ($10,016.56) |
| 6/9/2018 | ($1,874.00) | FLOOD INSURANCE | ($10,017.25) |
| 3/31/2018 | $0.66 | INTEREST ON ESCROW DEPOSIT | ($8,143.25) |
| 1/2/2018 | $0.02 | INTEREST ON ESCROW DEPOSIT | ($8,143.91) |
| 1/1/2018 | | | ($8,143.93) |

Reviewer ID: Sokhom_Sim_2019-04-12_13:27:00

# HOME EQUITY LINE OF CREDIT sm
## AGREEMENT AND DISCLOSURE STATEMENT

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $300,000.00 | 12-05-2006 | 12-05-2036 | | | | *** | |

References in the shaded area are for our use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "***" has been omitted due to text length limitations.

**Borrower:**  CHRISTOPHER BRADY
313 CEDAR AVE
MANASQUAN, NJ  08736

**Lender:**  JPMorgan Chase Bank, N.A.
Home Equity and Consumer Lending Division
1111 Polaris Parkway
Columbus, OH  43240

---

**CREDIT LIMIT: $300,000.00**                    **DATE OF AGREEMENT:  December 5, 2006**

**Introduction.** This HOME EQUITY LINE OF CREDIT AGREEMENT AND DISCLOSURE STATEMENT ("Agreement") governs your line of credit (the "Credit Line" or the "Credit Line Account") issued through JPMorgan Chase Bank, N.A.. In this Agreement, the words "Borrower," "you," "your," and "Applicant" mean each and every person who signs this Agreement, including all Borrowers named above. The words "we," "us," "our," and "Lender" mean JPMorgan Chase Bank, N.A.. You agree to the following terms and conditions:

**Promise to Pay.** You promise to pay JPMorgan Chase Bank, N.A., or order, the total of all credit advances and FINANCE CHARGES, together with all costs and expenses for which you are responsible under this Agreement or under the "Mortgage" which secures your Credit Line. You will pay your Credit Line according to the payment terms set forth below. If there is more than one Borrower, each is fully obligated to keep all of your promises and obligations contained in this Agreement. This means we can require any Borrower to pay all amounts due under this Agreement, including credit advances made to any Borrower. Each Borrower authorizes any other Borrower, on his or her signature alone, to cancel the Credit Line, to request and receive credit advances, and to do all other things necessary to carry out the terms of this Agreement. We can release any Borrower from responsibility under this Agreement, and the others will remain responsible.

**Term.** The term of your Credit Line will begin as of the date of this Agreement ("Opening Date") and will continue until December 5, 2036 ("Maturity Date"). All indebtedness under this Agreement, if not already paid pursuant to the payment provisions below, will be due and payable upon maturity. The draw period of your Credit Line will begin on a date, after the Opening Date, when the Agreement is accepted by us in the State of Ohio, following the expiration of the right to cancel, the perfection of the Mortgage, the receipt of all required certificates of noncancellation, and the meeting of all of our other conditions and will continue as follows: ten (10) years. The Draw Period is also referred to as the "First Payment Stream". You may obtain credit advances during this period ("Draw Period"). After the Draw Period ends, the repayment period will begin and you will no longer be able to obtain credit advances. The length of the repayment period is as follows: twenty (20) years. The Repayment Period is also referred to as the "Second Payment Stream". You agree that we may renew or extend the period during which you may obtain credit advances or make payments. You further agree that we may renew or extend your Credit Line Account.

**Minimum Payment.** During the Draw Period your Regular Payment will be equal to the amount of the FINANCE CHARGE accrued for the billing cycle for which the statement is rendered. You will make 120 of these payments. Your payments will be due Monthly. Advances to your credit line or an increase in the ANNUAL PERCENTAGE RATE may increase your Regular Payment. If you make only the Regular Payment during your Draw Period, the principal balance outstanding on your line will not be reduced as a consequence of your payment of only the FINANCE CHARGE due.

During the Repayment Period, your minimum monthly payments will be (a) the unpaid principal balance divided by the remaining number of scheduled payments, plus (b) the amount of finance charge accrued plus any fees and any amounts past due. You will make monthly payments as noted below during the Repayment Period.

| Range of Balances | Number of Payments | Amortization Period |
|---|---|---|
| All Balances | 240 | 240 payments |

Your "Minimum Payment" will be the Regular Payment, plus any amounts past due and all other charges. In addition, we have the right to require you to pay fees and charges assessed on the Credit Line Account with and in addition to the Minimum Payment. You agree to pay not less than the Minimum Payment on or before the due date indicated on your periodic billing statement. If your credit line balance falls below $100.00 during the Repayment Period, you agree to pay your balance in full.

**How Your Payments Are Applied.** Unless otherwise agreed or required by applicable law, payments and other credits will be applied to principal, interest, fees and other charges in any order. Except for any balances subject to the Conversion Options provisions of this Agreement, if your Credit Line Account has principal balances outstanding at different rates, we may apply principal payments first to outstanding balances at the lowest applicable rate before applying principal payments to balances accruing interest at a higher rate. We may apply all payments and credits in accordance with our standard operating procedures and with the requirements of applicable law. Notwithstanding anything to the contrary in this Agreement, we may apply our standard operating procedures to verify that we have received good funds after we received your payments before releasing the payment amounts as available credit on your Credit Line Account.

**Receipt of Payments.** All payments must be made by a check, automatic account debit, electronic funds transfer, money order, or other instrument in U.S. dollars and must be received by us at the remittance address shown on your periodic billing statement. Payments received at that address prior to close of business on any business day will be credited to your Credit Line as of the date received. If we receive payments at other locations, such payments will be credited promptly to your Credit Line, but crediting may be delayed for up to five (5) days after receipt.

**Credit Limit.** This Agreement covers a revolving line of credit for the principal amount of Three Hundred Thousand & 00/100 Dollars ($300,000.00), which will be your "Credit Limit" under this Agreement. During the Draw Period we will honor your request for credit advances subject to the section below on Lender's Rights. You may borrow against the Credit Line, repay any portion of the amount borrowed, and re-borrow up to the amount of the Credit Limit. Your Credit Limit is the maximum principal amount you may have outstanding at any one time. You agree not to attempt, request, or obtain a credit advance that will make your Credit Line Account balance exceed your Credit Limit. Your Credit Limit will not be increased should you overdraw your Credit Line Account. If you exceed your Credit Limit, you agree to repay immediately the amount by which your Credit Line Account exceeds your Credit Limit, even if we have not yet billed you. Any credit advances in excess of your Credit Limit will not be secured by the Mortgage covering your principal dwelling.

**Charges to your Credit Line.** We may charge your Credit Line to pay other fees and costs that you are obligated to pay under this Agreement, the Mortgage or any other document related to your Credit Line. In addition, we may charge your Credit Line for funds required for continuing insurance coverage as described in the paragraph titled "Insurance" below or as described in the Mortgage for this transaction. We may also, at our option, charge your Credit Line to pay any costs or expenses to protect or perfect our security interest in your principal dwelling. These costs or expenses include, without limitation, payments to cure defaults under any existing liens on your principal dwelling. If you do not pay your property taxes, we may charge your Credit Line and pay the delinquent taxes. Any amount so charged to your Credit Line will be a credit advance and will decrease the funds available, if any, under the Credit Line. However, we have no obligation to provide any of the credit advances referred to in this paragraph.

**Credit Advances.** After the Effective Disbursement Date of this Agreement, you may obtain credit advances under your Credit Line as follows:

Credit Line Checks. Writing a preprinted "credit line check" that we will supply to you.

Requests in Person. Requesting a credit advance in person at any of our authorized locations.

Credit Card Access. Using your "credit card" to receive cash advances or to make purchases.

ATM Access. Using your "credit card/ATM card" at any of our designated ATM locations.

If there is more than one person authorized to use this Credit Line Account, you agree not to give us conflicting instructions, such as one of you telling us not to give advances to the other.

**Limitations on the Use of Checks.** We reserve the right not to honor credit line checks in the following circumstances:

Credit Limit Violation. Your Credit Limit has been or would be exceeded by paying the credit line check.

Post-dated Checks. Your credit line check is post-dated. If a post-dated credit line check is paid and as a result any other check is returned or not paid, we are not responsible for any losses or damages you incur.

Stolen Checks. Your credit line checks have been reported lost or stolen.

Reviewer ID: Sokhom_Sim_2019-04-12_13:27:00

## HOME EQUITY LINE OF CREDIT AGREEMENT AND DISCLOSURE
### STATEMENT

Loan No: ███████████     (Continued)     Page 2

Unauthorized Signatures. Your credit line check is not signed by an "Authorized Signer" as defined below.

Termination or Suspension. Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the credit line check.

If we pay any credit line check under these conditions, you must repay us, subject to applicable laws, for the amount of the credit line check. The credit line check itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of a check is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. We may choose not to return credit line checks along with your periodic billing statements; however, your use of each credit line check will be reflected on your periodic statement as a credit advance. We do not "certify" credit line checks drawn on your Credit Line.

Limitations on the Use of Credit Cards. We reserve the right not to honor credit cards in the following circumstances:

Credit Limit Violation. Your Credit Limit has been or would be exceeded by paying the credit card charge.

Stolen Credit Cards. Your credit cards have been reported lost or stolen.

Unauthorized Signatures. Your credit card is not used by an "Authorized Signer" as defined below.

Termination or Suspension. Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we paid the Credit Line charge.

If we pay any advance requested by use of the credit card under these conditions, you must repay us, subject to applicable laws, for the amount of the advance. The advance itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of an advance is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. Your use of the credit card will be reflected on your periodic statement as a credit advance.

Limitations on the Use of ATM Cards. We reserve the right not to honor credit card/ATM cards in the following circumstances:

Credit Limit Violation. Your Credit Limit has been or would be exceeded by honoring the credit card/ATM card charge.

Stolen ATM Cards. Your credit card/ATM cards have been reported lost or stolen.

Unauthorized Signatures. Your credit card/ATM card is not used by an "Authorized Signer" as defined below.

Termination or Suspension. Your Credit Line has been terminated or suspended as provided in this Agreement or could be if we honored the Credit Line charge.

If we pay any advance requested by use of the credit card/ATM card under these conditions, you must repay us, subject to applicable laws, for the amount of the advance. The advance itself will be evidence of your debt to us together with this Agreement. Our liability, if any, for wrongful dishonor of an advance is limited to your actual damages. Dishonor for any reason as provided in this Agreement is not wrongful dishonor. Your use of the credit card/ATM card will be reflected on your periodic statement as a credit advance.

Transaction Requirements. The following transaction limitations will apply to the use of your Credit Line:

Credit Card Limitations. The following transaction limitations will apply to your Credit Line and using a Credit Card.

Other Transaction Requirements.
You agree not to use your credit card to initiate a transaction involving Internet gambling, regardless of the jurisdiction in which you are located, including locations within the United States, and the Bank has the right to refuse a transaction which it reasonably believes involves Internet gambling.

The maximum limit of each transaction per day may not exceed your current available balance or $99,999.99, whichever is less. For security reasons, there may be times when we further limit this amount, request authentication by the merchant or bank of your identity or decline the transaction even if you have the available funds.

ATM Access Limitations. The following transaction limitations will apply to your Credit Line and using an Automated Transaction Machine ("ATM") access card.

Other Transaction Requirements. Transactions conducted at ATMs are governed by the limitations of the individual ATM owners and may be subject to ATM fees and transaction limitations imposed by the ATM owner.

Credit Line credit line check and In Person Request Limitations. There are no transaction limitations for the writing of credit line checks or requesting an advance in person.

Authorized Signers. The words "Authorized Signer" for credit line checks, credit cards and credit card/ATM cards as used in this Agreement mean and include each person who signs this agreement.

Lost credit line checks, credit cards and credit card/ATM cards. If you lose your credit line checks, credit cards or credit card/ATM cards or if someone is using them without your permission, you agree to let us know immediately. The fastest way to notify us is by calling us at (800) 800-5626.

Liability For Unauthorized Use. You may be liable for the unauthorized use of your credit card access device which accesses your Credit Line. You will not be liable for unauthorized use that occurs after you notify us or our designee at JPMorgan Chase Bank, N.A., P.O. Box 901008, Fort Worth, TX 76101-2008., orally or in writing, of the loss, theft, or possible unauthorized use. In any case, your liability for unauthorized use of your credit card will not exceed $50.00.

If you use an access card which debits a checking account (or other consumer asset account) but also draws on an overdraft line of credit, Regulation E provisions apply, as well as sections 226.13(d) and (g) of Regulation Z. In such a transaction, you might be liable for up to $50.00 under Regulation Z. Also, you might be liable for $50.00, $500.00, or an unlimited amount under Regulation E, or a lesser amount under applicable state law. Please refer to your electronic fund transfers disclosure for liability limitations and error-resolution procedures for transactions covered by the federal Electronic Fund Transfers Act.

Future Credit Line Services. Your application for this Credit Line also serves as a request to receive any new services (such as access devices) which may be available at some future time as one of our services in connection with this Credit Line. You understand that this request is voluntary and that you may refuse any of these new services at the time they are offered. You further understand that the terms and conditions of this Agreement will govern any transactions made pursuant to any of these new services.

Collateral. You acknowledge this Agreement is secured by a Consumer Mortgage - Plain Language dated December 5, 2006, to us on real property located in MONMOUTH County, State of New Jersey, all the terms and conditions of which are hereby incorporated and made a part of this Agreement. If there is any inconsistency between the terms and conditions of this Agreement and the terms and conditions of the collateral documents, the terms and conditions of this Agreement shall prevail.

Insurance. You must obtain insurance on the Property securing this Agreement that is reasonably satisfactory to us. You may obtain property insurance through any company of your choice that is reasonably satisfactory to us. You have the option of providing any insurance required under this Agreement through an existing policy or a policy independently obtained and paid for by you, subject to our right, for reasonable cause before credit is extended, to decline any insurance provided by you. In no event however, pursuant to Section 38.9 of the New York Banking Board Regulations, will you be required to provide hazard insurance in excess of the replacement value of the buildings and other improvements on the Property. Subject to applicable law, if you fail to obtain or maintain insurance as required in the Mortgage, we may purchase insurance to protect our own interest, add the premium to your balance, pursue any other remedies available to us, or do any one or more of these things.

Periodic Statements. If you have a balance owing on your Credit Line Account or have any account activity, we will send you a periodic statement. It will show, among other things, credit advances, FINANCE CHARGES, other charges, payments made, other credits, your "Previous Balance," and your "New Balance." Your statement also will identify the Minimum Payment you must make for that billing period and the date it is due.

When FINANCE CHARGES Begin to Accrue. Periodic FINANCE CHARGES for credit advances under your Credit Line will begin to accrue on the date credit advances are posted to your Credit Line. There is no "free ride period" which would allow you to avoid a FINANCE CHARGE on your Credit Line credit line advances.

Method Used to Determine the Balance on Which the FINANCE CHARGE Will Be Computed. A daily FINANCE CHARGE will be imposed on all credit advances made under your Credit Line imposed from the date of each credit advance based on the "daily balance" method. To get the daily balance, we take the beginning balance of your Credit Line Account each day, add any new advances and subtract any payments or credits and any unpaid FINANCE CHARGES. This gives us the "daily balance."

Method of Determining the Amount of FINANCE CHARGE. Any FINANCE CHARGE is determined by applying the "Periodic Rate" to the balance

## HOME EQUITY LINE OF CREDIT AGREEMENT AND DISCLOSURE STATEMENT
(Continued)

Loan No: ▓▓▓▓▓▓▓                                                              Page 3

described herein. Then we add together the periodic FINANCE CHARGES for each day in the billing cycle. This is your FINANCE CHARGE calculated by applying a Periodic Rate.

Periodic Rate and Corresponding ANNUAL PERCENTAGE RATE. We will determine the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE as follows. We start with an independent index which is the Prime Rate. Prime Rate means the base rate on corporate loans posted by at least 75% of the USA's largest banks known as The Wall Street Journal Prime Rate and published in The Wall Street Journal (or alternate publication if required) on each publication day of each month. If more than one rate is published as the prime rate, the Prime Rate will be the highest rate called "the Prime Rate" (the "Index"). We will use the most recent Index value available to us as of the date of any ANNUAL PERCENTAGE RATE adjustment. The Index is not necessarily the lowest rate charged by us on our loans. If the Index becomes unavailable during the term of this Agreement, we may designate a substitute index after notice to you. To determine the Periodic Rate that will apply to your First Payment Stream, we subtract a margin from the value of the Index, then divide the value by the number of days in a year (daily). To obtain the ANNUAL PERCENTAGE RATE we multiply the Periodic Rate by the number of days in a year (daily). This result is the ANNUAL PERCENTAGE RATE for your First Payment Stream. To determine the Periodic Rate that will apply to your Second Payment Stream, we subtract a margin from the value of the Index, then divide the value by the number of days in a year (daily). To obtain the ANNUAL PERCENTAGE RATE we multiply the Periodic Rate by the number of days in a year (daily). This result is the ANNUAL PERCENTAGE RATE for your Second Payment Stream. The ANNUAL PERCENTAGE RATE includes only interest and no other costs.

The Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE on your Credit Line will increase or decrease as the Index increases or decreases from time to time. Any increase in the Periodic Rate during the Second Payment Stream will take the form of a higher Minimum Payment amount. Adjustments to the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE resulting from changes in the Index will take effect on the first calendar day following the publication of a new Prime Rate. In no event will the corresponding ANNUAL PERCENTAGE RATE be more than the greater of 21.00000% or the maximum rate we would be allowed to charge or collect by federal law or the law of the State of Ohio (as applicable). On the day we prepared this document, the Index was 8.250% per annum, and therefore the Initial Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE on your Credit Line are estimated below. Your Initial Periodic Rate and corresponding ANNUAL PERCENTAGE RATE will be based on the Index in effect on your closing date.

### Current Rates for the First Payment Stream

| Range of Balance or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| All Balances | -0.760 % | 7.490 % | 0.02052 % |

### Current Rates for the Second Payment Stream

| Range of Balance or Conditions | Margin Added to Index | ANNUAL PERCENTAGE RATE | Daily Periodic Rate |
|---|---|---|---|
| All Balances | -0.760 % | 7.490 % | 0.02052 % |

Notwithstanding any other provision of this Agreement, we will not charge interest on any undisbursed loan proceeds, except as may be permitted during any Right of Rescission period. No matter what else may be stated in any other provision of this Agreement or in any other document you may have with us, you do not agree or intend to pay, and we do not agree or intend to charge any interest or fee for the HOME EQUITY LINE OF CREDIT AGREEMENT AND DISCLOSURE STATEMENT which would in any way cause us to contract for, charge or collect more for the Credit Line Account than the maximum we would be permitted to charge or collect by any applicable federal or Ohio state law. Any such excess interest or unauthorized fee will be applied first to reduce the unpaid principal balance of the Credit Line Account, and when the principal has been paid in full, be refunded to you.

Conversion Options. This Agreement contains an option to convert the interest rate from a variable rate with interest rate limits to a fixed rate as calculated below. The following information is representative of conversion features recently offered by us.

ANNUAL PERCENTAGE RATE Increase. Your ANNUAL PERCENTAGE RATE may increase if you exercise this option to convert to a fixed rate.

Conversion Periods. With our written consent, any one of you can exercise the option to convert to a fixed rate (a "Lock") for either the entire outstanding balance on the Credit Line Account or any portion thereof (but not less than $1,000.00). Any Locks you take immediately at closing cannot exceed 95% of your Credit Limit.

Fully Amortizing Lock Option. At any time during the Draw Period, you can choose a Lock that will fully amortize in substantially equal monthly installments for a term of up to the lesser of 30 years or the remaining originally scheduled term of your Credit Line account.

Reduced Payment Lock Options. During the Draw Period, you can choose a 3, 5 or 7 year Lock term with a reduced payment requirement. At the end of the 3, 5, or 7 year period selected, your Lock will mature. However, you cannot choose a Reduced Payment Lock option that will mature later than 1 full month before the originally scheduled end of your Draw Period. At the time you select your Reduced Payment Lock option, you must choose from the following payment options on the Lock:

(1) Pay the amount of interest that accrues on that Lock for the billing cycle for which the statement is rendered.

(2) Pay the greater of the amount of interest that accrues on that Lock for the billing cycle for which the statement is rendered, or 1% of the outstanding balance on your Lock, but if the balance on your Lock falls below $100.00, you will pay your Lock balance in full.

(3) Pay the amount that would be required to fully repay the Lock over a 360 month term in substantially equal installments.

Maturity Options for Reduced Payment Locks. If you select a Reduced Payment Lock Option, at the maturity of such a Lock you will have the following options:

(1) If you are still within the Draw Period, you can re-Lock the remaining Lock balance using the Fully Amortizing Lock option described above.

(2) If you are still within the Draw Period, you can re-Lock the remaining Lock balance using the Reduced Payment Lock options described above. However, you cannot choose a Reduced Payment Lock option that will mature later than 1 full month before the originally scheduled end of your Draw Period.

(3) You can roll the remaining balance of your Lock into your Credit Line at the standard Credit Line terms under this Agreement. If you make no election, we will select this option for you.

General Lock Provisions. You may have up to 5 Locks outstanding at any one time but may not make additional advances to any one Lock once established. The total outstanding balance on any Lock will not be subject to the "Credit Advances" and "Minimum Payment" section of this Agreement. Your Minimum Payment due each month will be the sum of the payment amount for each Lock plus the minimum payment amount for the balance of your Account which has not been designated as a Lock (the "Credit Line"), calculated using the formula set forth in the "Minimum Payment" section of this Agreement. Additional payments in any Lock may be made at any time but shall not affect your obligation to pay succeeding Lock payments as long as any amount is still owing on the Lock. Any payment made upon your outstanding principal balance in any Lock will be available on the Credit Line for you to draw against upon posting of such payment prior to the maturity date. If your outstanding balance includes one or more Locks as well as a balance on your Credit Line, unless you properly designate otherwise on a payment coupon we provide you, then each additional payment we receive will be first applied to the Credit Line until paid in full. Also, unless you properly designate otherwise on a payment coupon we provide you, if there is no Credit Line to which to apply an additional principal payment, then the additional principal payment will be applied to the Lock first opened until paid in full. Additional Lock payments will not affect your obligation to pay succeeding Lock payments as long as any amount is still owing on the Lock unless we otherwise agree in writing.

Upon conversion, the converted outstanding balance will accrue interest at a fixed rate as calculated in the Rate Determination section and as otherwise provided in this Agreement.

Conversion Fees. You will be required to pay the following fees at the time of conversion to a fixed rate: We may charge you $0.00 for each Lock that we set up at your request.

Cancellation of Lock. If you later request that we cancel a Lock, we may permit you to do so if you agree to pay the Lock cancellation fee that is in effect at the time of cancellation for each Lock you cancel. You will be required to sign an amendment to this Agreement which will contain the amount of the agreed upon cancellation fee.

Reviewer ID: Sokhom_Sim_2019-04-12_13:27:00

## HOME EQUITY LINE OF CREDIT AGREEMENT AND DISCLOSURE
### STATEMENT
Loan No:                                    (Continued)                                    Page 4

**Annual Fee Waiver.** If you Lock at least $25,000 immediately upon opening this Credit Line Account, we will waive the Annual Fee for as long as the initial Lock remains open.

**Rate Determination.** The fixed rate will be determined as follows: We will start with the "Lock Index," which is the yield on U.S. Treasury securities having a comparable period of maturity to the scheduled maturity of the requested Lock as of the 15th day of the month immediately preceding the month in which you request your Lock. If the Lock Index becomes unavailable during the term of this Agreement, we may designate a substitute index after notice to you. We will then add 10 percentage points to the Lock Index. Your fixed lock rate (the "Fixed Lock Rate") will be the lowest of the following: the amount arrived at from the foregoing calculation, 21%, or the maximum rate we are allowed to charge you at the time of your lock under federal law, which for the purposes of 12 U.S.C. Section 85 incorporates Ohio law. We will then review the rates and terms available for a comparable Home Equity Loan offered by us at the time of your request based upon a like loan to value ratio, loan term and your credit profile. In the case of a Reduced Payment Lock Option, we will also consider the rate we might offer for a loan of a similar term. If, after that review we determine that we can offer you a lower rate than the Fixed Lock Rate, we will give you the lower rate. We will provide a complete disclosure of the terms of the Lock at the time the Lock is established.

**Conditions Under Which Other Charges May Be Imposed.** You agree to pay all the other fees and charges related to your Credit Line as set forth below:

**Annual Fee.** The Annual Fee for the first year is waived. Thereafter, a nonrefundable Annual Fee of $50.00 will be charged to your Credit Line beginning on your first anniversary date and will continue annually throughout the Draw Period.

**Payment of Closing Costs.** If you elect to charge your Credit Line Account to pay the closing costs associated with your Credit Line (such as title insurance premiums, appraisal fees, credit report fees, and recording fees), the total of these charges will be reflected as "closing costs" on your first periodic billing statement.

**Returned Items.** You may be charged $25.00 if you pay your Credit Line obligations with a check, draft, or other item that is dishonored for any reason.

**Fee to Stop Payment.** Your Credit Line Account may be charged $15.00 when you request a stop payment on your account.

**Overlimit Charge.** Your Credit Line Account may be charged $25.00 for each credit advance in excess of your Credit Limit. This includes writing a credit line check in excess of your available balance.

**Late Charges.** Your payment will be late if it is not received by us within 15 days of the "Payment Due Date" shown on your periodic statement. If your payment is late we may charge you $25.00.

**Fee to Close Account.** If you close or terminate your Credit Line Account, you may be charged the following: Your Credit Line Account may be charged the lesser of 1% of your Credit Line or $400.00 if you close or terminate your Credit Line Account within three (3) years from the Loan Date shown above. You will not be charged this fee if we suspend or terminate your Credit Line Account. You may prepay your Credit Line Account without paying this fee as long as you do not close or terminate your Credit Line Account.

**Lien Release Fees.** In addition to all other charges, you agree, to the extent not prohibited by law, to pay all governmental fees for release of our security interests in collateral securing your Credit Line. You will pay these fees at the time the lien or liens are released. The estimated amount of these future lien release fees is $40.00.

**Other Charges.** Your Credit Line Account may be charged the following other charges:

**Account Return Check Charge.** We may charge you a fee for the return of a check because you are delinquent or in default in any respect concerning the Credit Line Account. The amount of this other charge is: 25.00.

The charges listed in the following Security Interest Charges paragraph (if such paragraph is present) are part of the closing or settlement costs associated with your Credit Line.

**Lender's Rights.** Under this Agreement, we have the following rights:

**Termination and Acceleration.** We can terminate your Credit Line Account and subject to any notice requirement or other limitation of applicable law require you to pay us the entire outstanding balance in one payment, and charge you certain fees, if any of the following happen:

(1) You commit fraud or make a material misrepresentation at any time in connection with this Credit Agreement. This can include, for example, a false statement about your income, assets, liabilities, or any other aspects of your financial condition.

(2) You do not meet the repayment terms of this Credit Agreement.

(3) Your action or inaction adversely affects the collateral for the plan or our rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the dwelling, failure to pay taxes, death of all persons liable on the account, transfer of title or sale of the dwelling, creation of a senior lien on the dwelling without our permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

**Suspension or Reduction.** In addition to any other rights we may have, we can suspend additional extensions of credit or reduce your Credit Limit during any period in which any of the following are in effect:

(1) The value of your property declines significantly below the property's appraised value for purposes of this Credit Line Account. This includes, for example, a decline such that the initial difference between the Credit Limit and the available equity is reduced by fifty percent and may include a smaller decline depending on the individual circumstances.

(2) We reasonably believe that you will be unable to fulfill your payment obligations under your Credit Line Account due to a material change in your financial circumstances.

(3) You are in default under any material obligations of this Credit Line Account. We consider all of your obligations to be material. Categories of material obligations include the events described above under Termination and Acceleration, obligations to pay fees and charges, obligations and limitations on the receipt of credit advances, obligations concerning maintenance or use of the property or proceeds, obligations to pay and perform the terms of any other deed of trust, mortgage or lease of the property, obligations to notify us and to provide documents or information to us (such as updated financial information), obligations to comply with applicable laws (such as zoning restrictions), and obligations of any comaker. No default will occur until we mail or deliver a notice of default to you, so you can restore your right to credit advances.

(4) We are precluded by government action from imposing the ANNUAL PERCENTAGE RATE provided for under this Agreement.

(5) The priority of our security interest is adversely affected by government action to the extent that the value of the security interest is less than one hundred twenty percent (120%) of the Credit Limit.

(6) We have been notified by governmental authority that continued advances may constitute an unsafe and unsound business practice.

**Change in Terms.** We may make changes to the terms of this Agreement if you agree to the change in writing at that time, if the change will unequivocally benefit you throughout the remainder of your Credit Line Account, or if the change is insignificant (such as changes relating to our data processing systems). If the Index is no longer available, we will choose a new Index and margin. The new Index will have an historical movement substantially similar to the original Index, and the new Index and margin will result in an ANNUAL PERCENTAGE RATE that is substantially similar to the rate in effect at the time the original index becomes unavailable. We may prohibit additional extensions of credit or reduce your Credit Limit during any period in which the maximum ANNUAL PERCENTAGE RATE under your Credit Line Account is reached.

**Expenses.** To the extent not prohibited by applicable law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights, shall become a part of the loan payable on demand, and shall bear interest at the Note rate from the date of expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's expenses for bankruptcy proceedings (including efforts to modify or vacate the automatic stay or injunction) and appeals, to the extent permitted by applicable law.

**Access Devices.** If your Credit Line is suspended or terminated, you must immediately return to us all credit line checks and any other access devices. Any use of credit line checks or other access devices following suspension or termination may be considered fraudulent. You will also remain liable for any further use of credit line checks or other Credit Line access devices not returned to us.

**Delay in Enforcement.** We may delay or waive the enforcement of any of our rights under this Agreement without losing that right or any other right. If we delay or waive any of our rights, we may enforce that right at any time in the future without advance notice. For example, not terminating your account for non-payment will not be a waiver of our right to terminate your account in the future if you have not paid.

## HOME EQUITY LINE OF CREDIT AGREEMENT AND DISCLOSURE
### STATEMENT

Loan No: ███████████                                          (Continued)                                          Page 5

---

**Cancellation by you.** If you cancel your right to credit advances under this Agreement, you must notify us and return all credit line checks and any other access devices to us. Despite cancellation, your obligations under this Agreement will remain in full force and effect until you have paid us all amounts due under this Agreement.

**Prepayment.** You may prepay all or any amount owing under this Credit Line at any time without penalty, except we will be entitled to receive all accrued FINANCE CHARGES, and other charges, if any. Payments in excess of your Minimum Payment will not relieve you of your obligation to continue to make your Minimum Payments. Instead, they will reduce the principal balance owed on the Credit Line. You agree not to send us payments marked "paid in full", "without recourse", or similar language. If you send such a payment, we may accept it without losing any of our rights under this Agreement, and you will remain obligated to pay any further amount owed to us. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: JPMorgan Chase Bank, N.A., P.O. Box 901008 Fort Worth, TX 76101-2008.

**Notices.** All notices will be sent to your address as shown in this Agreement. Notices will be mailed to you at a different address if you give us written notice of a different address. You agree to advise us promptly if you change your mailing address.

**Credit Information and Related Matters.** You agree that everything that you have stated in the application for this Agreement is correct to the best of your knowledge. You understand that we will retain the application whether or not credit is approved. You are informed that we may have requested a consumer report (credit report in connection with the application) and that, if you ask us, we will inform you if such a report was requested and give you the name and address of the consumer reporting agency that furnished the report. You are also informed that subsequent consumer reports may be requested, or used, in connection with any update, renewal or extension of the credit applied for. You authorize us to obtain such reports, to check your employment history and to answer questions about our credit experience with you. You authorize us to release information about you to third parties as described in our privacy policy and our Fair Credit Reporting Act notice, provided you did not opt out of the applicable policy, or as permitted by law. We may require a new appraisal of the Property which secures your Credit Line at any time, including an internal inspection, at our sole option and expense.

**Transfer or Assignment.** Without prior notice or approval from you, we reserve the right to sell or transfer your Credit Line Account and our rights and obligations under this Agreement to another lender, entity, or person, and to assign our rights under the Mortgage. Your rights under this Agreement belong to you only and may not be transferred or assigned. Your obligations, however, are binding on your heirs and legal representatives. Upon any such sale or transfer, we will have no further obligation to provide you with credit advances or to perform any other obligation under this Agreement.

**Tax Consequences.** You understand that neither we, nor any of our employees or agents, make any representation or warranty whatsoever concerning the tax consequences of your establishing and using your Credit Line, including the deductibility of interest, and that neither we nor our employees or agents will be liable in the event interest on your Credit Line is not deductible. You should consult your own tax advisor for guidance on this subject.

**Notify Us of Inaccurate Information We Report To Consumer Reporting Agencies.** Please notify us if we report any inaccurate information about your account(s) to a consumer reporting agency. Your written notice describing the specific inaccuracy(ies) should be sent to us at the following address: JPMorgan Chase Bank, N.A. P.O. Box 901008  Fort Worth, TX 76101-2008

**Periodic Review.** We will conduct a periodic review of your Credit Line Account, based on credit and financial information we may obtain or receive from you from time to time.

**Collection Costs.** If you are in default under the terms of this Agreement, we may take all lawful action under applicable law to collect the money you owe us. It is our intent to collect only those attorney's fees and those expenses, court and collection costs permitted by the laws of your state and the United States (including the bankruptcy laws of the United States). You agree to pay only those collection costs and attorney's fees that we actually incur and that we may lawfully collect from you. If the laws of your state will not let us collect all or some of these collection costs and attorney's fees from you, we will not do so. To the extent the laws of your state prohibit us from contracting with you to collect such fees or costs or prohibit us from including this provision in your agreement with us, this provision is severed from this Agreement, is of no force and effect and your contract will be read and interpreted without this provision except to the extent federal law may now or hereafter preempt the law of your state.

**CREDIT CARD ACCESS.** Notwithstanding anything contained in this Agreement to the contrary, credit card access may not be available in your state. If credit card access is permitted in your state and becomes available, we will so advise you and will issue a credit card to you upon your request. Any credit card issued in connection with the Home Equity Line of Credit account is NOT a debit card. The words "credit card" as used in this Agreement mean the VISA or MasterCard that may be issued to you as an access device to your Credit Line Account. VISA is a registered service mark of Visa, U.S.A., Inc. MasterCard is a registered service mark of MasterCard International Incorporated.

**FOREIGN TRANSACTIONS.** Lender will charge, and Borrower will pay, in U.S. dollars for all foreign transactions at the exchange rate in effect at the time the transaction is entered to Borrower's Credit Line Account, including any special currency exchange charges.

**IDENTITY OF LENDER.** Lender is JPMorgan Chase Bank, N.A., a national banking association organized and existing under the laws of the United States of America, with its main offices located in Columbus, Ohio.

**Check Safekeeping.** Lender will retain your cancelled Credit Line Checks, and will not return them with your Credit Line Account statement. You agree that your cancelled Credit Line Checks will not be returned in your statement and that the original cancelled Credit Line Checks may be destroyed after a reasonable period of time as determined by Lender. You agree that by maintaining the original Credit Line Check or a copy thereof on your behalf, Lender has otherwise made the Credit Line Check available to you in a reasonable manner. You may request a copy of any cancelled Credit Line Check. If for any reason Lender cannot return a copy of your Credit Line Check or satisfy your needs through other means, you agree that Lender will not be liable for more than the face amount of the Credit Line Check.

**Information Sharing.** Our privacy policy, which has been provided to you describes our information sharing practices and gives directions on how to opt out, or direct us to limit the sharing of Personal Information (as defined in the privacy policy) about you with other companies or organizations. You hereby agree that, if you choose not to exercise the opt outs described in the privacy policy, you will be deemed to have authorized us to share any Personal Information about you (including information related to any of the products or services you may have with any JPMorgan Chase & Co. affiliate) with other companies or other organizations.

**Supplement to Charges to your Credit Line.** If you do not pay the fees and charges for which you are obligated or that we may charge under the terms of this Agreement at the time you are required to pay them, we have the right, but not the obligation, to charge your Credit Line for those past due fees and charges to the extent permitted by the law governing this transaction. Any amount so charged to your Credit Line will be a credit advance, bear interest at the Periodic Rate and the corresponding ANNUAL PERCENTAGE RATE until paid, and will decrease the funds available, if any, under the Credit Line. This paragraph supplements and amends but does not replace the Charges to your Credit Line paragraph.

**Stop Payments.** You may ask us to "stop payment" on a credit line check. If you do, you must tell us the name of the payee, the amount, date and number of the credit line check and who signed it. We are not bound by a stop payment order unless we have a reasonable opportunity to act on it and will not be liable for failing to stop payment if we used ordinary care. You agree to indemnify us and will pay all costs and expenses we incur (including reasonable attorney fees) as a result of honoring your stop payment order. This indemnity will survive any termination of this Agreement. You agree to pay the fee indicated in the Conditions Under Which Other Charges May Be Imposed section of this document for each request to "stop payment" on a credit line check.

**Additional Restriction on Access Devices.** You may not use your credit line checks, your credit card, or any other credit access device made available to make payments on your Credit Line Account.

**Governing Law.** This agreement will be governed by and interpreted in accordance with federal law and the laws of the State of New York, except for matters related to interest and the exportation of interest, which matters will be governed by and interpreted in accordance with federal law (including, but not limited to, statutes, regulations, interpretations, and opinions) and laws of the State of Ohio. However, if there ever is a question about whether any provision of the agreement is valid or enforceable, the provision that is questioned will be governed by whichever state or federal law would find the provision to be valid and enforceable. The loan transaction which is evidenced by this and other related documents has been approved, made and funded, and all necessary documents have been accepted by Lender in the State of Ohio.

**Caption Headings.** Caption headings in this Agreement are for convenience purposes only and are not to be used to interpret or define the provisions of this Agreement.

**Interpretation.** You agree that this Agreement, together with the Mortgage, is the best evidence of your agreements with us. If we go to court for any reason, we can use a copy, filmed or electronic, of any periodic statement, this Agreement, the Mortgage or any other document to prove what you owe us or that a transaction has taken place. The copy, microfilm, microfiche, or optical image will have the same validity as the original. You agree that, except to the extent you can show there is a billing error, your most current periodic statement is the best evidence of your obligation to pay.

Reviewer ID: Sokhom_Sim_2019-04-12_13:27:00

## HOME EQUITY LINE OF CREDIT AGREEMENT AND DISCLOSURE STATEMENT

| Loan No: ▮▮▮▮▮▮▮ | (Continued) | Page 6 |
|---|---|---|

**Severability.** If a court finds that any provision of this Agreement is not valid or should not be enforced, that fact by itself will not mean that the rest of this Agreement will not be valid or enforced. Therefore, a court will enforce the rest of the provisions of this Agreement even if a provision of this Agreement may be found to be invalid or unenforceable.

**Acknowledgment.** You understand and agree to the terms and conditions in this Agreement. By signing this Agreement, you acknowledge that you have read this Agreement. You also acknowledge receipt of a completed copy of this Agreement, including the Fair Credit Billing Notice and the early home equity line of credit application disclosure, in addition to the handbook entitled "When Your Home Is On the Line: What You Should Know About Home Equity Lines of Credit," given with the application.

BORROWER:

X _____
CHRISTOPHER BRADY, Individually

Effective Disbursement Date: The first business day after December 8, 2006.

Reviewer ID: Sokhom_Sim_2019-04-12_13:27:00

## HOME EQUITY LINE OF CREDIT AGREEMENT AND DISCLOSURE
### STATEMENT

Loan No [REDACTED]

(Continued)

Page 7

## BILLING ERROR RIGHTS

### YOUR BILLING RIGHTS

### KEEP THIS NOTICE FOR FUTURE USE

This notice contains important information about your rights and our responsibilities under the Fair Credit Billing Act.

**Notify us in case of errors or questions about your bill.**

If you think your bill is wrong, or if you need more information about a transaction on your bill, write us on a separate sheet at

JPMorgan Chase Bank, N.A.
Credit Line Billing Notices
P.O. Box 901008
Fort Worth, TX 76101-2008

or at the address listed on your bill. Write to us as soon as possible. We must hear from you no later than sixty (60) days after we sent you the first bill on which the error or problem appeared. You can telephone us, but doing so will not preserve your rights.

In your letter, give us the following information:

Your name and account number.

The dollar amount of the suspected error.

Describe the error and explain, if you can, why you believe there is an error. If you need more information, describe the item you are not sure about.

If you have authorized us to pay your bill automatically from your savings or checking account, you can stop the payment on any amount you think is wrong. To stop the payment, your letter must reach us three (3) business days before the automatic payment is scheduled to occur.

**Your rights and our responsibilities after we receive your written notice.**

We must acknowledge your letter within thirty (30) days, unless we have corrected the error by then. Within ninety (90) days, we must either correct the error or explain why we believe the bill was correct.

After we receive your letter, we cannot try to collect any amount you question, or report you as delinquent. We can continue to bill you for the amount you question, including finance charges, and we can apply any unpaid amount against your Credit Limit. You do not have to pay any questioned amount while we are investigating, but you are still obligated to pay the parts of your bill that are not in question.

If we find that we made a mistake on your bill, you will not have to pay any finance charges related to any questioned amount. If we didn't make a mistake, you may have to pay finance charges, and you will have to make up any missed payments on the questioned amount. In either case, we will send you a statement of the amount you owe and the date on which it is due.

If you fail to pay the amount that we think you owe, we may report you as delinquent. However, if our explanation does not satisfy you and you write to us within ten (10) days telling us that you still refuse to pay, we must tell anyone we report you to that you have a question about your bill. And, we must tell you the name of anyone we reported you to. We must tell anyone we report you to that the matter has been settled between us when it finally is.

If we don't follow these rules, we can't collect the first $50 of the questioned amount, even if your bill was correct.

### Special Rule for Credit Card Purchases

If you have a problem with the quality of property or services that you purchased with a credit card, and you have tried in good faith to correct the problem with the merchant, you may have the right not to pay the remaining amount due on the property or services. There are two limitations on this right:

(a) You must have made the purchase in your home state or, if not within your home state within 100 miles of your current mailing address; and

(b) The purchase price must have been more than $50.00.

These limitations do not apply if we own or operate the merchant, or if we mailed you the advertisement of the property or services.

Reviewer ID: Sokhom_Sim_2019-04-12_13:27:00

DEC 1 4 2006

BRADY, CHRISTOPHER
DEED OF TRUST / MORTGAGE

WHEN RECORDED MAIL TO:
JPMorgan Chase Bank. N.A.
Retail Loan Servicing KY2-1606
P.O. Box 11606
Lexington. KY  40576-1606

FOR RECORDER'S USE ONLY

This Mortgage prepared by:  X ____DAMIAN McPHERSON_____

Name of Signer: ~~ASHLEIGH RYCROFT~~. PROCESSOR

# MORTGAGE

INDEX.  The following index is for convenience purposes only and is not to be used to interpret or to define any provisions of this Security Instrument.

1.  DEFINITIONS
    (A)  Borrower
    (B)  Credit Agreement
    (C)  Lender
    (D)  Owner
    (E)  Property
    (F)  Related Documents
    (G)  Security Instrument
    (H)  Sums Secured
2.  OWNER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY
3.  DESCRIPTION OF THE PROPERTY
4.  OWNER'S RIGHT TO MORTGAGE THE PROPERTY AND OWNER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY
5.  OWNER'S PROMISE TO PAY
6.  OWNER'S OBLIGATION TO PAY CHARGES. ASSESSMENTS AND CLAIMS
7.  NO CLAIM FOR CREDIT FOR TAXES
8.  OWNER'S OBLIGATION TO MAINTAIN HAZARD INSURANCE
9.  OWNER'S OBLIGATION TO MAINTAIN THE PROPERTY
10.  LENDER'S RIGHT TO PROTECT ITS RIGHTS IN THE PROPERTY: MORTGAGE INSURANCE
11.  POSSESSION AND USE
12.  LENDER'S RIGHT TO INSPECT THE PROPERTY
13.  AGREEMENTS ABOUT CONDEMNATION OF THE PROPERTY
14.  CONTINUATION OF OWNER'S OBLIGATIONS AND OF LENDER'S RIGHTS
    (A)  Owner's Obligations
    (B)  Lender's Rights
15.  OWNER'S OBLIGATIONS AND THOSE OF PERSONS TAKING OVER OWNER'S OBLIGATIONS
16.  LOAN CHARGES
17.  LEGISLATION AFFECTING LENDER'S RIGHTS
18.  NOTICES REQUIRED UNDER THIS SECURITY INSTRUMENT
19.  GOVERNING LAW
20.  OWNER'S COPY
21.  AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED
22.  DEFAULT
23.  LENDER'S RIGHTS UPON DEFAULT
    (A)  Accelerate Payment
    (B)  Lender In Possession
    (C)  Judicial Foreclosure
    (D)  Nonjudicial Sale
    (E)  My Payment of Rent
    (F)  Deficiency Judgment
    (G)  Election of Remedies
    (H)  Expenses
24.  LENDER'S OBLIGATION TO DISCHARGE THIS SECURITY INSTRUMENT
25.  IDENTITY OF LENDER
26.  NON-WAIVER
27.  SUPPLEMENT TO PERSONAL PROPERTY DEFINITION
28.  DUE ON SALE - CONSENT BY LENDER
29.  SUPPLEMENT TO OWNER'S OBLIGATION TO MAINTAIN HAZARD INSURANCE
30.  MISCELLANEOUS PROVISIONS
    (A)  Amendments
    (B)  Merger
    (C)  Time is of the Essence
    (D)  Waivers and Consents

1.  DEFINITIONS.  The following words are used often in this document. When they are used. they will have the following meanings:

(A) Borrower.  CHRISTOPHER BRADY and all other persons and entities signing the Note will sometimes be called "Borrower".

(B) Credit Agreement.  The note or credit agreement signed by Borrower and dated December 5. 2006 will be called the "Note." The Note is in the original amount of $300.000.00.  This amount is called "principal."  The word "Note" includes all renewals of. extensions of. modifications of and substitutions for the promissory note or credit agreement.  The interest rate on the Note is a variable interest rate based upon an index.  The index currently is 8.250% per annum.  If the index increases. the payments tied to the index. and therefore the total amount secured hereunder. will increase.  Any variable interest rate tied to the index shall be calculated as of. and shall begin on. the commencement date indicated for the applicable payment stream.  Notwithstanding the foregoing. the variable interest rate or rates provided for in this Security Instrument shall be subject to the following maximum rate. NOTICE: Under no circumstances will the interest rate on the Credit Agreement be more than the lesser of 21.000% per annum or the maximum rate allowed by applicable law.  Specifically. without limitation. this Security Instrument secures a revolving line of credit. under which Lender may make advances to Borrower so long as Borrower complies with all the terms of the Credit Agreement.  The maturity date of this Security Instrument is December 5. 2036. NOTICE TO OWNER: THE CREDIT AGREEMENT CONTAINS A VARIABLE INTEREST RATE.

(C) Lender.  JPMorgan Chase Bank, N.A. will be called "Lender."

(D) Owner.  CHRISTOPHER BRADY sometimes will be called "Owner" and sometimes simply "I" or "me."

(E) Property.  The property that is described in the section titled "DESCRIPTION OF THE PROPERTY" will be called the "Property".

(F). Related Documents.  All promissory notes, credit agreements, loan agreements, environmental agreements, guaranties, security

RECORDED ON
2006184659
INSTRUMENT NUMBER
MONMOUTH COUNTY, NJ
M CLAIRE FRENCH, CTY CLK
DEC 19, 2006
11:35:05 AM
BOOK: OR-8617
PAGE: 5378
Total Pages: 5

RECORDING  $70.00
REALTY  FEES
TOTAL  $70.00

Reviewer ID: soxhom_sfm_2019-04-12_13:27:00

**MORTGAGE**
(Continued)

Page 2

Loan No: ████████

agreements, mortgages, deeds of trust, security deeds, collateral mortgages, and all other instruments, agreements and documents, whether now or hereafter existing, executed in connection with the Sums Secured will be called "Related Documents".

(G) **Security Instrument.** This mortgage document will also be called the "Security Instrument."

(H) **Sums Secured.** The amounts described below in the section titled "OWNER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY" sometimes will be called the "Sums Secured." The lien of this Security Instrument will not exceed at any one time the principal amount of $300,000.00, plus accrued interest, payments made by Lender for taxes and insurance, and any other payments made by Lender as provided for in this Security Instrument.

**THIS MORTGAGE IS DATED December 5, 2006, BETWEEN CHRISTOPHER BRADY, A MARRIED MAN,** whose address is 313 CEDAR AVE, MANASQUAN, NJ 08736 (sometimes below will be called "Owner," "Borrower," "I," or "me"); and JPMorgan Chase Bank, N.A., whose address is Home Equity and Consumer Lending Division, 1111 Polaris Parkway, Columbus, OH 43240 (sometimes below will be called "Lender").

2. **OWNER'S TRANSFER TO LENDER OF RIGHTS IN THE PROPERTY.** I mortgage, grant and convey to Lender the Property, subject to the terms of this Security Instrument, to have and to hold all of the Property to Lender, and to its successors and assigns, forever. This means that, by signing this Security Instrument, I am giving Lender those rights that are stated in this Security Instrument and also those rights that the law gives to lenders who hold mortgages on real property. Those rights that the law gives to lenders who hold mortgages on real property include those rights known as "Mortgage Covenants." I am giving Lender these rights to protect Lender from possible losses that might result if I fail to do any of the following:

(A) Pay all the amounts that I owe Lender as stated in the Credit Agreement;

(B) Pay, with interest, any amounts that Lender spends under this Security Instrument to protect the value of the Property and Lender's rights in the Property; and

(C) Keep all of my other promises and agreements under this Security Instrument.

3. **DESCRIPTION OF THE PROPERTY.** I mortgage, grant and convey to Lender the Property described in (A) through (I) below.

(A) This Property is located in **MONMOUTH** County, State of New Jersey:

TAX ID NO. BLOCK 123 LOT 17.01 THE PROPERTY IS LOCATED IN THE BOROUGH OF MANASQUAN COUNTY OF MONMOUTH AND STATE OF NEW JERSEY KNOWN AND DESIGNATED AS LOTS 17 AND 18 IN BLOCK 18 ON MAP ENTITLED "SECTION NO. 1, MANASQUAN SHORES BOROUGH OF MANASQUAN MONMOUTH COUNTY NEW JERSEY" MADE BY SINCERBEAUX MOORE AND SHINN, CIVIL ENGINEERS MARCH 1927 REVISED OCTOBER 28 1927 DULY FILED IN THE MONMOUTH COUNTY CLERKS OFFICE ON APRIL 25 1929 AND MORE PARTICULARLY DESCRIBED AS FOLLOWS: BEGINNING AT A POINT FORMED BY THE INTERSECTION OF THE SOUTHWESTERLY LINE OF CEDAR AVENUE WITH THE NORTHWESTERLY LINE OF FARRAGUT AVENUE AND RUNNING THENCE 1 NORTH 41 DEGREES WEST ALONG THE SOUTHWESTERLY LINE OF CEDAR AVENUE 50 FEET TO A POINT THENCE 2 SOUTH 49 DEGREES WEST 100 FEET TO A POINT IN THE CENTER LINE OF THE BLOCK THENCE 3 SOUTH 41 DEGREES EAST ALONG THE CENTER LINE OF THE BLOCK 50 FEET TO A POINT IN THE NORTHWESTERLY LINE OF FARRAGUT AVENUE THENCE 4 NORTH 49 DEGREES EAST ALONG THE NORTHWESTERLY LINE OF FARRAGUT AVENUE 100 FEET TO THE SOUTHWESTERLY LINE OF CEDAR AVENUE AND THE POINT OR PLACE OF BEGINNING.

The Real Property or its address is commonly known as 313 CEDAR AVE, MANASQUAN, NJ 08736. The Real Property tax identification number is BLOCK 123 LOT 17.01.

(B) All buildings and other improvements that are located on the Property described in subparagraph (A) of this section;

(C) All rights in other property that I have as owner of the Property described in subparagraph (A) of this section. These rights are known as "easements, rights and appurtenances attached to the Property;"

(D) All rents and royalties from the Property described in subparagraph (A) of this section;

(E) All mineral, oil and gas rights and profits, water rights and stock that are part of the Property described in subparagraph (A) of this section;

(F) All rights that I have in the land which lies in the streets or roads in front of, or next to, the Property described in subparagraph (A) of this section;

(G) All fixtures that are now or in the future will be on the Property described in subparagraphs (A) and (B) of this section;

(H) All of the rights and property described in subparagraphs (B) through (G) of this section that I acquire in the future; and

(I) All replacements of or additions to the Property described in subparagraphs (B) through (I) of this section.

4. **OWNER'S RIGHT TO MORTGAGE THE PROPERTY AND OWNER'S OBLIGATION TO DEFEND OWNERSHIP OF THE PROPERTY.** I promise that: (A) I lawfully own the Property; (B) I have the right to mortgage, grant and convey the Property to Lender; and (C) there are no outstanding claims or charges against the Property, except for those which are of public record.

I give a general warranty of title to Lender. This means that I will be fully responsible for any losses which Lender suffers because someone other than myself has some of the rights in the Property which I promise that I have. I promise that I will defend my ownership of the Property against any claims of such rights.

THIS MORTGAGE IS GIVEN TO SECURE (A) PAYMENT OF THE SUMS SECURED AND (B) PERFORMANCE OF ALL OF MY OBLIGATIONS UNDER THIS MORTGAGE. I PROMISE AND I AGREE WITH LENDER AS FOLLOWS:

5. **OWNER'S PROMISE TO PAY.** I will pay to Lender on time principal and interest due under the Credit Agreement and any prepayment charges due under the Credit Agreement.

6. **OWNER'S OBLIGATION TO PAY CHARGES, ASSESSMENTS AND CLAIMS.** I will pay all taxes, assessments, and any other charges and fines that may be imposed on the Property and that may be superior to this Security Instrument. I will do this by making the payments on time to the person owed them. (In this Security Instrument, the word "person" means any person, organization, governmental authority or other party.) If I make direct payments, then promptly after making any of those payments I will give Lender a receipt which shows that I have done so.

Any claim, demand or charge that is made against the Property because an obligation has not been fulfilled is known as a "lien." I must promptly pay or satisfy a superior lien unless: (A) I agree, in writing, to pay the obligation which gave rise to the superior lien and Lender approves the way in which I agree to pay that obligation; or (B) in good faith, I argue or defend against the superior lien in a lawsuit so that, during the lawsuit, the superior lien may not be enforced and no part of the Property must be given up; or (C) I secure from the holder of that other lien an agreement, approved in writing by Lender, that the lien of this Security Instrument is superior to the lien held by that person. If Lender determines that any part of the Property is subject to a superior lien, Lender may give me a notice identifying the superior lien. I will then pay or satisfy the superior lien or take one or more of the actions set forth above within 10 days of the giving of notice.

7. **NO CLAIM FOR CREDIT FOR TAXES.** I will not make deduction from or claim credit on the principal or interest secured by this Security Instrument by reason of any governmental taxes, assessments or charges. I will not claim any deduction from the taxable value of the Property by reason of this Security Instrument.

8. **OWNER'S OBLIGATION TO MAINTAIN HAZARD INSURANCE.** I will obtain hazard insurance to cover all buildings and other improvements that now are or in the future will be located on the Property. The insurance must cover loss or damage caused by fire, hazards normally covered by "extended coverage" hazard insurance policies and other hazards for which Lender requires coverage. The insurance must be in the amounts and for the periods of time required by Lender. If the Property is or becomes located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, I agree to obtain and maintain Federal Flood Insurance for the full unpaid principal balance of the loan and any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender. I agree to maintain such insurance for the term of the loan. In no event, however, shall I be required to provide hazard insurance in excess of the replacement value of the buildings and other improvements on the Property. I may choose the insurance company, but my choice is subject to Lender's approval. Lender may not refuse to approve my choice unless the refusal is reasonable.

All of the insurance policies and renewals of those policies must include what is known as a "standard mortgagee clause" to protect Lender

| Loan No: | **MORTGAGE**<br>(Continued) | Page 3 |
| --- | --- | --- |

The form of all policies and renewals must be acceptable to Lender. Lender will have the right to hold the policies and renewals. If Lender requires, I will promptly give Lender all receipts of paid premiums and renewal notices that I receive.

If there is a loss or damage to the Property, I will promptly notify the insurance company and Lender. If I do not promptly prove to the insurance company that the loss or damage occurred, then Lender may do so.

The amount paid by the insurance company is called "proceeds." The proceeds will be used to repair or to restore the damaged Property unless: (A) it is not economically feasible to make the repairs or restoration; or (B) the use of the proceeds for that purpose would lessen the protection given to Lender by this Security Instrument; or (C) Lender and I have agreed in writing not to use the proceeds for that purpose. If the repair or restoration is not economically feasible or if it would lessen Lender's protection under this Security Instrument, then the proceeds will be used to reduce the amount that is owed to Lender under the Credit Agreement and under this Security Instrument. If any of the proceeds remain after the amount that is owed to Lender has been paid in full, the remaining proceeds will be paid to me.

If I abandon the Property, or if I do not answer, within thirty (30) days, a notice from Lender stating that the insurance company has offered to settle a claim, Lender may collect the proceeds. Lender may use the proceeds to repair or restore the Property or to pay the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of principal which is owed to Lender under the Credit Agreement, that use will not delay the due date or change the amount of any of the monthly payments under the Credit Agreement and under the Paragraph titled "MONTHLY PAYMENTS FOR TAXES AND INSURANCE" above. However, I and Lender may agree in writing to those delays or changes.

If Lender acquires the Property as provided below, all of my rights in the insurance policies will belong to Lender. Also, all of my rights in any proceeds which are paid because of damage that occurred before the Property is acquired by Lender or sold will belong to Lender. However, Lender's rights in those proceeds will not be greater than the Sums Secured immediately before the Property is acquired by Lender or sold.

9. OWNER'S OBLIGATION TO MAINTAIN THE PROPERTY. I will keep the Property in good repair. I will not destroy, damage or substantially change the Property, and I will not allow the Property to deteriorate.

10. LENDER'S RIGHT TO PROTECT ITS RIGHTS IN THE PROPERTY; MORTGAGE INSURANCE. If I fail to comply with any provision of this Security Instrument, or if any action or proceeding is commenced that would materially affect Lender's interests in the Property, Lender on my behalf may, but will not be required to, take any action that Lender thinks to be appropriate. Any amount that Lender spends or incurs in so doing will bear interest at the rate charged under the Credit Agreement from the date incurred or paid by Lender to the date of my repayment. All such expenses, at Lender's option, will (A) be payable on demand, (B) be added to the balance of the Credit Agreement and be apportioned among and be payable with any installment payments to become due either during the term of any applicable insurance policy or during the remaining term of the Credit Agreement, or (C) be treated as a balloon payment which will be due and payable at the Credit Agreement's maturity. This Security Instrument also will secure payment of these amounts. The rights provided for in this paragraph will be in addition to any other rights or any remedies to which Lender may be entitled on account of the default. Any action taken by Lender under this paragraph will not constitute a cure of any default so as to bar Lender from any remedy that it otherwise would have had under this Security Instrument.

If Lender required mortgage insurance as a condition for my loan, I will pay the premiums for that mortgage insurance. I will pay the premiums until the requirement for mortgage insurance ends according to my written agreement with Lender or according to law.

11. POSSESSION AND USE. Until in default, I may remain in possession and control of and operate and manage the Property.

12. LENDER'S RIGHT TO INSPECT THE PROPERTY. Lender, and others authorized by Lender, may enter on and inspect the Property. They must do so in a reasonable manner and at reasonable times. Before, or at the time an inspection is made, Lender must give me notice stating a reasonable purpose for the inspection.

13. AGREEMENTS ABOUT CONDEMNATION OF THE PROPERTY. A taking of property by any governmental authority by eminent domain is known as "condemnation." I give to Lender my right: (A) to proceeds of all awards or claims for damages resulting from condemnation or other governmental taking of the Property; and (B) to proceeds from a sale of the Property that is made to avoid condemnation. All of those proceeds will be paid to Lender.

If all of the Property is taken, the proceeds will be used to reduce the Sums Secured. If any of the proceeds remain after the amount that I owe to Lender has been paid in full, the remaining proceeds will be paid to me. Unless Lender and I agree otherwise in writing, if only a part of the Property is taken, the amount that I owe to Lender will be reduced only by the amount of proceeds multiplied by the following fraction: (A) the total amount of the Sums Secured immediately before the taking, divided by (B) the fair market value of the Property immediately before the taking. The remainder of the proceeds will be paid to me.

If I abandon the Property, or if I do not answer, within thirty (30) days, a notice from Lender stating that a governmental authority has offered to make a payment or to settle a claim for damages, Lender has the authority to collect the proceeds. Lender may then use the proceeds to repair or restore the Property or to reduce the Sums Secured. The 30-day period will begin when the notice is given.

If any proceeds are used to reduce the amount of principal which is owed to Lender under the Credit Agreement, that use will not delay the due date or change the amount of any of the monthly payments under the Credit Agreement. However, Lender and I may agree in writing to those delays or changes.

14. CONTINUATION OF OWNER'S OBLIGATIONS AND OF LENDER'S RIGHTS.

(A) Owner's Obligations. Lender may allow a person who takes over my rights and obligations to delay or to change the amount of the monthly payments of principal and interest due under the Credit Agreement or under this Security Instrument. Even if Lender does this, however, that person and I will both still be fully obligated under the Credit Agreement and under this Security Instrument.

Lender may allow delays or changes for a person who takes over my rights and obligations, even if Lender is not requested to do so. Lender will not be required to bring a lawsuit against such a person for not fulfilling obligations under the Credit Agreement or under this Security Instrument, even if Lender is requested to do so.

(B) Lender's Rights. Even if Lender does not exercise or enforce any right of Lender under this Security Instrument or under the law, Lender will still have all of those rights and may exercise and enforce them in the future. Even if Lender obtains insurance, pays taxes, or pays other claims, charges or liens against the Property, Lender will have the right to demand immediate payment in full of the amounts that are owed to Lender under the Credit Agreement or under this Security Instrument.

15. OWNER'S OBLIGATIONS AND THOSE OF PERSONS TAKING OVER OWNER'S OBLIGATIONS. Any person who takes over my rights or obligations under this Security Instrument will have all of my rights and will be obligated to keep all of my promises and agreements made in this Security Instrument. Similarly, any person who takes over Lender's rights or obligations under this Security Instrument will have all of Lender's rights and will be obligated to keep all of Lender's agreements made in this Security Instrument.

If more than one person signs this Security Instrument as Owner, each of us is fully obligated to keep all of Owner's promises and obligations contained in this Security Instrument. Lender may enforce Lender's rights under this Security Instrument against each of us individually or against all of us together.

16. LOAN CHARGES. If the Credit Agreement secured by this Security Instrument is subject to a law which sets maximum Credit Agreement charges, and that law is finally interpreted so that the interest or other Credit Agreement charges collected or to be collected in connection with the Credit Agreement exceed permitted limits: (A) any such charge will be reduced by the amount necessary to reduce the charge to the permitted limit; and (B) any sums already collected from me which exceeded permitted limits will be refunded to me. Lender may choose to make this refund by reducing the principal owed under the Credit Agreement or by making a direct payment to me. If a refund reduces principal, the reduction will be treated as a partial prepayment without any prepayment charge under the Credit Agreement.

17. LEGISLATION AFFECTING LENDER'S RIGHTS. If a change in applicable law would make any provision of the Credit Agreement or this Security Instrument unenforceable, Lender may require immediate payment in full of all Sums Secured by this Security Instrument as that phrase is defined above. If Lender requires immediate payment in full under this Paragraph, Lender will take the steps and may act as specified below.

18. NOTICES REQUIRED UNDER THIS SECURITY INSTRUMENT. Any notice that must be given to me under this Security Instrument will be given by delivering it or by mailing it by first class, certified or registered mail unless applicable law requires use of another method. The notice will be addressed to me at the address shown at the beginning of this Security Instrument. A notice will be given to me at a different address if I give Lender notice of my different address. Any notice that must be given to Lender under this Security Instrument will be given by mailing it to the Lender's address shown at the beginning of this Security Instrument. A notice will be mailed to Lender at a different address if Lender gives me a notice of the different address. A notice required by this Security Instrument is given when it is mailed or when it is delivered according to the requirements of this Paragraph or of applicable law. Notwithstanding the foregoing, the address for notice for Lender is: JPMorgan Chase Bank, N.A., P.O. Box 901008, Fort Worth, TX 76101-2008.

19. GOVERNING LAW. This agreement will be governed by and interpreted in accordance with federal law and the laws of the State of New York except for matters related to: (1) interest and the exportation of interest, which will be governed by and interpreted in accordance with

Loan No:  ▒▒▒▒▒▒▒▒

**MORTGAGE**
(Continued)

Page 4

federal law (including, but not limited to, statutes, regulations, interpretations, and opinions) and the laws of the State of Ohio; and (2) the validity and enforcement of Lender's security interest in the Property, which will be governed by the laws of the State where the Property is located. However, if there ever is a question about whether any provision of the agreement is valid or enforceable, the provision that is questioned will be governed by whichever of the governing state or federal laws that would find the provision to be valid and enforceable. The loan transaction which is evidenced by this and other related documents has been approved, made and funded, and all necessary documents have been accepted by Lender in the State of Ohio.

20. **OWNER'S COPY.** I will be given one conformed copy of the Credit Agreement and of this Security Instrument.

21. **AGREEMENTS ABOUT LENDER'S RIGHTS IF THE PROPERTY IS SOLD OR TRANSFERRED.** Lender may require immediate payment in full of all Sums Secured by this Security Instrument if all or any part of the Property, or if any right in the Property, is sold or transferred without Lender's prior written permission. Lender also may require immediate payment in full if a beneficial interest in Owner is sold or transferred and Owner is not a natural person. However, Lender will not require immediate payment in full if this is prohibited by federal law as of the date of this Security Instrument.

22. **DEFAULT.** At Lender's option, I will be in default under this Security Instrument if any of the following happen: (A) I commit fraud or make a material misrepresentation at any time in connection with the Credit Agreement. This can include, for example, a false statement about my income, assets, liabilities, or any other aspects of my financial condition. (B) I do not meet the repayment terms of the Credit Agreement. (C) My action or inaction adversely affects the collateral for the credit line account or Lender's rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the Property, failure to pay taxes, death of all persons liable on the credit line account, transfer of title or sale of the dwelling, creation of a lien on the dwelling without our permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes. (3) My action or inaction adversely affects the collateral for the credit line account or Lender's rights in the collateral. This can include, for example, failure to maintain required insurance, waste or destructive use of the Property, failure to pay taxes, death of all persons liable on the credit line account, transfer of title or sale of the dwelling, creation of a lien on the dwelling without our permission, foreclosure by the holder of another lien, or the use of funds or the dwelling for prohibited purposes.

23. **LENDER'S RIGHTS UPON DEFAULT.** If I am in default under this Security Instrument, this is what Lender may do, in addition to any other rights or remedies provided by law:

(A) **Accelerate Payment.** Lender shall have the right at its option without notice to me to require that I pay immediately the entire amount then remaining unpaid under the Credit Agreement and under this Security Instrument, including any prepayment penalty which I would be required to pay.

(B) **Lender in Possession.** Upon acceleration of the Sums Secured or abandonment of the Property, Lender (in person, by agent or by judicially appointed receiver) shall be entitled to enter upon, take possession of and manage the Property and to collect the rents, including those past due. Any rents collected by Lender or the receiver shall be applied first to payment of the costs of management of the Property and collection of rents, including but not limited to receiver's fees, premiums on the receiver's bonds and reasonable attorneys' fees and then to the other Sums Secured secured by this Security Instrument.

(C) **Judicial Foreclosure.** Lender may obtain a judicial decree foreclosing my interest in all or any part of the Property.

(D) **Nonjudicial Sale.** If permitted by applicable law, Lender may foreclose my interest in the Property by non-judicial sale.

(E) **My Payment of Rent.** If there is a judgment for Lender in a lawsuit for foreclosure and sale, I will pay to Lender reasonable rent from the date the judgment is entered for as long as I occupy the Property. However, this does not give me the right to occupy the Property.

(F) **Deficiency Judgment.** If permitted by applicable law, Lender may obtain a judgment for any deficiency remaining on the Sums Secured after application of all amounts received from the exercise of the rights provided in this section.

(G) **Election of Remedies.** All of Lender's rights and remedies will be cumulative and may be exercised alone or together. An election by Lender to choose any one remedy will not bar Lender from using any other remedy. If Lender decides to spend money or to perform any of my obligations under this Security Instrument, after my failure to do so, that decision by Lender will not affect Lender's right to declare me in default and to exercise Lender's remedies.

(H) **Expenses.** To the extent not prohibited by applicable law, all reasonable expenses Lender incurs that in Lender's opinion are necessary at any time for the protection of its interest or the enforcement of its rights, shall become a part of the loan payable on demand, and shall bear interest at the Note rate from the date of expenditure until repaid. Expenses covered by this paragraph include, without limitation, however subject to any limits under applicable law, Lender's expenses for bankruptcy proceedings (including efforts to modify or vacate the automatic stay or injunction) and appeals, to the extent permitted by applicable law.

24. **LENDER'S OBLIGATION TO DISCHARGE THIS SECURITY INSTRUMENT.** When Lender has been paid all amounts due under the Credit Agreement and under this Security Instrument I elect to terminate the Credit Agreement, Lender will discharge this Security Instrument by delivering a certificate stating that this Security Instrument has been satisfied. I will not be required to pay Lender for the discharge, but I will pay all costs of recording the discharge in the proper official records.

25. **IDENTITY OF LENDER.** Lender is JPMorgan Chase Bank, N.A., a national banking association organized and existing under the laws of the United States of America, with its main offices located in Columbus, Ohio.

26. **NON-WAIVER.** A waiver by any party of a breach of a provision of this Mortgage shall not constitute a waiver of or prejudice the party's right otherwise to demand strict compliance with that provision or any other provision.

27. **SUPPLEMENT TO PERSONAL PROPERTY DEFINITION.** It is the intention of Lender only to take a security interest in and retain a lien on that personal property considered fixtures under the Uniform Commercial Code as adopted in the jurisdiction where this Mortgage is filed of record as same may be amended from time to time or such other statute of such jurisdiction that defines property affixed to real estate and no other personal property.

28. **DUE ON SALE - CONSENT BY LENDER.** Lender may, at Lender's option, declare immediately due and payable all sums secured by this Mortgage upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable federal or state law.

29. **SUPPLEMENT TO OWNER'S OBLIGATION TO MAINTAIN HAZARD INSURANCE.** The above referenced paragraph is amended to change the required Federal Flood Insurance amount as follows: If the Property is or becomes located in an area designated by the Director of the Federal Emergency Management Agency as a special flood hazard area, I/We agree to obtain and maintain Federal Flood Insurance for the maximum amount of my/our credit line and the full unpaid principal balance of any prior liens on the property securing the loan, up to the maximum policy limits set under the National Flood Insurance Program, or as otherwise required by Lender. The remainder of the paragraph remains as stated in the above referenced paragraph.

30. **MISCELLANEOUS PROVISIONS.** The following miscellaneous provisions are a part of this Security Instrument:

(A) **Amendments.** What is written in this Security Instrument and in the Related Documents is my entire agreement with Lender concerning the matters covered by this Security Instrument. To be effective, any change or amendment to this Security Instrument must be in writing and must be signed by whoever will be bound or obligated by the change or amendment.

(B) **Merger.** There shall be no merger of the interest or estate created by this Security Instrument with any other interest or estate in the Property at any time held by or for the benefit of Lender in any capacity, without the written consent of Lender.

(C) **Time is of the Essence.** Time is of the essence in the performance of this Security Instrument. This means that all deadlines for performance provided under this Security Instrument must be strictly complied with and that failure to do so will result in a default.

(D) **Waivers and Consents.** Lender will not be deemed to have waived any rights under this Security Instrument unless such waiver is in writing and signed by Lender. No delay or omission on the part of Lender in exercising any right will operate as a waiver of such right or any other right. A waiver by any party of a provision of this Security Instrument will not constitute a waiver of or prejudice the party's right otherwise to demand strict compliance with that provision or any other provision. No prior waiver by Lender, nor any course of dealing between Lender and me, will constitute a waiver of any of Lender's rights or any of my obligations as to any future transactions. Whenever consent by Lender is required in this Security Instrument, the granting of such consent by Lender in any instance will not constitute continuing consent to later instances where such consent is required.

I ACKNOWLEDGE HAVING READ ALL THE PROVISIONS OF THIS SECURITY INSTRUMENT, AND I AGREE TO ITS TERMS.

I ACKNOWLEDGE RECEIPT, WITHOUT CHARGE, OF A TRUE AND CORRECT COPY OF THIS SECURITY INSTRUMENT.

Reviewer ID: Sokhom_Sim_2019-04-12_13:27:00

Loan No: ███████████

**MORTGAGE**
(Continued)

Page 5

OWNER:

X _Christopher Brady_
CHRISTOPHER BRADY, Individually

## INDIVIDUAL ACKNOWLEDGMENT

STATE OF _New York_                     )
                                        ) SS
COUNTY OF _New York_                    )

BE IT REMEMBERED that on this _____5th_____ day of _December_, 20 _06_, before me, the undersigned authority, personally appeared CHRISTOPHER BRADY who, I am satisfied, is the person named in the foregoing instrument, and I having first made known to him or her the contents thereof, he or she acknowledged that he or she signed, sealed and delivered the same as his or her voluntary act and deed. All of which is hereby certified.

SHEILA SIMMONS
NOTARY PUBLIC, STATE OF NEW YORK
QUALIFIED IN BRONX COUNTY
NO. 01SI6146411
MY COMMISSION EXPIRES MAY 15, 2010

_Sheila Simmons_
[Notary Public]

Reviewer ID: Sokhom_Sim_2019-04-12_13:27:00

UNITED STATES BANKRUPTCY COURT
DISTRICT OF NEW JERSEY

Caption in Compliance with D.N.J. LBR 9004-1(b)

**FEIN, SUCH, KAHN & SHEPARD, P.C.**
Counsellors at Law
7 Century Drive - Suite 201
Parsippany, New Jersey 07054
(973) 538-9300
Attorneys for Secured Creditor
JPMORGAN CHASE BANK, NATIONAL
ASSOCIATION
JILL A. MANZO, ESQ.
297GSU
bankruptcy@feinsuch.com

| | |
|---|---|
| In Re:<br><br>CHRISTOPHER BRADY<br><br> Debtor(s). | Case No.:  19-11703 MBK<br><br>Chapter: 13<br><br>Adv. No.:<br><br>Hearing Date:  N/A<br><br>Judge:  Honorable Michael B. Kaplan |

**CERTIFICATION OF SERVICE**

1.    I, <u>Tina DeLibro</u>                :

☐ represent the _____ in this matter.

☒ am the secretary/paralegal for <u>FEIN, SUCH, KAHN & SHEPARD, P.C.,</u>

who represents the <u>Secured Creditor, JPMORGAN CHASE BANK, NATIONAL</u>

<u>ASSOCIATION</u> in this matter.

☐ am the _____ in the above case and am

representing myself.

2.    On _____<u>April 16, 2019</u>_____, This office caused to be

mailed a copy of the following pleadings and/or documents to the

parties listed in the chart below:

a.    Proof of Claim.

| Name and Address of Party Served | Relationship of Party to the Case | Mode of Service |
|---|---|---|
| TIMOTHY P. NEUMANN BROEGE, NEUMANN, FISCHER & SHAVER 25 ABE VOORHEES DRIVE MANASQUAN, NJ 08736 | Debtor(s)' Attorney | ☐ Hand-delivered ☒ Regular mail ☐ Certified mail/RR ☒ Other: Notice of Electronic Filing (D.N.J. LBR 5005-1) |
| ALBERT RUSSO STANDING CHAPTER 13 TRUSTEE CN 4853 TRENTON, NJ 08650-4853 | Trustee in Bankruptcy | ☐ Hand-delivered ☒ Regular mail ☐ Certified mail/RR ☒ Other: Notice of Electronic Filing (D.N.J. LBR 5005-1) |
| U.S. TRUSTEE US DEPT OF JUSTICE OFFICE OF THE US TRUSTEE ONE NEWARK CENTER STE 2100 NEWARK, NJ 07102 | U.S. Trustee | ☐ Hand-delivered ☒ Regular mail ☐ Certified mail/RR ☒ Other: Notice of Electronic Filing (D.N.J. LBR 5005-1) |
| CHRISTOPHER BRADY 313 CEDAR AVE MANASQUAN, NJ 08736-3701 | Debtor(s) | ☐ Hand-delivered ☒ Regular mail ☐ Certified mail/RR ☐ Other: Notice of Electronic Filing (D.N.J. LBR 5005-1) |

3.   I hereby certify under penalty of perjury that the above documents were sent using the mode of service indicated.


Dated: April 16, 2019                    /S/ TINA DELIBRO
                                         Tina DeLibro
                                         Legal Assistant

## U.S. Bankruptcy Court

### District of New Jersey

Notice of Electronic Claims Filing

The following transaction was received from Manzo, Jill on 4/16/2019 at 4:04 PM EDT

File another claim

| | |
|---|---|
| **Case Name:** | Christopher Brady |
| **Case Number:** | 19-11703-MBK |
| **Creditor Name:** | JPMORGAN CHASE BANK, N.A.<br>P.O. BOX 24785<br>COLUMBUS, OH 43224 |
| **Claim Number:** | 2   Claims Register |

**Amount Claimed:** $381,624.07
**Amount Secured:** $381624.07
**Amount Priority:**

The following document(s) are associated with this transaction:

**Document description:**Main Document
**Original filename:**\\FS1\Users\tdelibro\Desktop\BK-297GSU-POC (4-16-2019).pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1002741850 [Date=4/16/2019] [FileNumber=53341632-0] [0c6654b2bc5ca71d088fbc6f56e45cb904fbd53bb02d8a99453d1aa13ad33198f0 d1570f443d70bd26d67ecd143a39929796845d7c6acfccb8711e1887ea3ef4]]
**Document description:**Certificate of Service
**Original filename:**\\FS1\Users\tdelibro\Desktop\BK-297GSU-COS (4-16-2019).pdf
**Electronic document Stamp:**
[STAMP bkecfStamp_ID=1002741850 [Date=4/16/2019] [FileNumber=53341632-1] [074abf44368ea11f8e79121b17b4ca7feab100d5cd469dbe4ecc4b023af8ac3fff e239814f20e752a7441318786851335f81f2621a96020cc068ee70d001b9f4]]

**19-11703-MBK Notice will be electronically mailed to:**

R. A. Lebron on behalf of Creditor JPMORGAN CHASE BANK, NATIONAL ASSOCIATION
bankruptcy@feinsuch.com

Jill Manzo on behalf of Creditor JPMORGAN CHASE BANK, NATIONAL ASSOCIATION
bankruptcy@feinsuch.com

Timothy P. Neumann on behalf of Debtor Christopher Brady
timothy.neumann25@gmail.com,
btassillo@aol.com;geoff.neumann@bnfsbankruptcy.com;tneumann.bnfs@gmail.com

Albert Russo
docs@russotrustee.com

U.S. Trustee
USTPRegion03.NE.ECF@usdoj.gov

**19-11703-MBK Notice will not be electronically mailed to:**